## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO

_____

| | |
|---|---|
| FEDERAL ENERGY REGULATORY COMMISSION, | ) ) ) |
| Petitioner, | ) ) |
| v. | ) |
| COALTRAIN ENERGY, L.P., PETER JONES, SHAWN SHEEHAN, ROBERT JONES, JEFF MILLER, AND JACK WELLS, | ) ) ) ) ) |
| Respondents. | ) ) |

Case No. 2:16-cv-732

_____)

### PETITION FOR AN ORDER AFFIRMING THE FEDERAL ENERGY REGULATORY COMMISSION'S MAY 27, 2016 ORDER ASSESSING CIVIL PENALTIES AGAINST COALTRAIN ENERGY, L.P., PETER JONES, SHAWN SHEEHAN, ROBERT JONES, JEFF MILLER, AND JACK WELLS

Pursuant to section 31(d)(3)(B) of the Federal Power Act, 16 U.S.C.

§ 823b(d)(3)(B) (2010), Petitioner Federal Energy Regulatory Commission ("FERC" or

"Commission") petitions this Court to review, affirm, and enforce the Commission's May

27, 2016 order (1) finding that (a) Coaltrain Energy, L.P. ("Coaltrain"), Peter Jones,

Shawn Sheehan, Robert Jones, Jeff Miller, and Jack Wells (together, "Respondents")

used financial instruments to manipulate and defraud the nation's largest wholesale

energy market, (b) Coaltrain made false and misleading statements and material

omissions in a bid to cover-up the manipulative scheme, and (2) assessing a total of $38

million in civil penalties and $4.12 million in disgorgement. *Coaltrain Energy, L.P.,*

*Peter Jones, Shawn Sheehan, Robert Jones, Jeff Miller, Jack Wells, and Adam Hughes*,

155 FERC ¶ 61,204 (2016) ("Order Assessing Penalties" or "Order").[1]  The Order is

attached as Exhibit 1 and incorporated in its entirety in this Petition.

### SUMMARY OF THE ACTION

1.      Following an investigation by the Commission's Office of Enforcement

("Enforcement") and a public show cause proceeding before the Commission, the

Commission found that Respondents manipulated and defrauded the nation's largest

Commission-regulated energy market, and made false statements during the investigation

in an attempted cover-up.

2.      The Commission authorizes certain types of financial trading in

Commission-regulated markets to help the markets deliver better results for producers

and consumers, and such financial trades help set the wholesale price of electricity.  Here,

Respondents used financial instruments that allow traders to profit when they correctly

predict that the difference in the price of electricity at two different locations (*i.e.* the

"price spread") would either widen or narrow from one day to the next.  Apart from

whether these trades proved to be profitable, the market allocated traders a credit based

on the volume of these and other trades.  The Commission found that Respondents

defrauded the market by executing a scheme to trade these instruments not to profit based

on price spread arbitrage, as the product was designed, but instead to profit solely or

primarily from this credit.  Respondents harmed the market by diverting credits that

---

[1] In the Order, the Commission stated that it "declines to find Mr. Hughes in violation of section 222 of the [Federal Power Act] and the Anti-Manipulation Rule." Order at 1 n.3.  Therefore, Hughes is not a respondent here.

should have been paid to other market participants, and by tying up transmission that other market participants could have used for legitimate trading.

3.      The Commission also found that Coaltrain violated the Commission's regulations by intentionally making false and misleading statements and material omissions to Enforcement in an effort to cover-up evidence of the manipulative scheme. Coaltrain had in its possession an enormous cache of documents recorded and preserved by the company's computer security monitoring software.  The records included many thousands of documents and screenshots that were responsive to Enforcement's data requests.  Despite this, Respondents did not produce the documents or tell Enforcement about them.  Instead, Peter Jones signed affidavits swearing that the company's responses were "true, complete, and accurate."  Enforcement later discovered the existence of the documents from a former Coaltrain employee.  When Enforcement asked the company to produce the documents, Respondents initially, and falsely, denied that they could access the records.  When Enforcement persisted, Respondents eventually produced the documents, and they proved to be crucial to the investigation.

4.      This proceeding began on January 6, 2016, when the Commission issued an Order to Show Cause notifying Respondents of Enforcement's allegations.  During the proceeding, the Commission and Respondents were furnished with a copy of the investigative materials, including transcripts of each individual Respondents' oral testimony and millions of pages of documents and data.  In their Answers, Respondents submitted more than 450 pages of legal and fact arguments, including an expert report as

3

well as affidavits from each of the individual Respondents. Enforcement presented the Commission with evidence from its investigation that had begun in August 2010.

5.      On May 27, 2016, after examining the administrative record and evaluating the parties' submissions, the Commission issued its factual findings and determinations in a detailed, 183-page Order Assessing Penalties. The Commission ordered: (a) Coaltrain, jointly and severally with its co-owners Peter Jones and Shawn Sheehan, to disgorge $4,121,894 in unjust profits; (b) Coaltrain, jointly and severally with its co-owners Peter Jones and Shawn Sheehan, to pay $26 million in civil penalties; (c) Peter Jones separately to pay $5 million in civil penalties; (d) Shawn Sheehan separately to pay $5 million in civil penalties; (e) Robert Jones to pay $1 million in civil penalties; (f) Jeff Miller to pay $500,000 in civil penalties; and, (g) Jack Wells to pay $500,000 in civil penalties. Order at PP 289-360, Ordering Paras. A-G.

6.      Respondents did not comply with the Commission's Order to pay the penalties and disgorgement within 60 days. Because Respondents waived their opportunity for an on-the-record agency hearing governed by the Administrative Procedure Act, the statute directs the Commission to submit this Petition asking the Court to affirm and enforce the Order Assessing Penalties, and in conducting this proceeding the Court has "authority to review de novo the law and facts involved." Federal Power Act section 31(d)(3), 16 U.S.C. § 823b(d)(3).

# PARTIES

### A.  Petitioner

7.      FERC is an administrative agency of the United States, organized and existing pursuant to, *inter alia*, the Federal Power Act, codified at 16 U.S.C. § 791a *et seq*. ("FPA").  Under the FPA, the Commission is charged (among other things) with ensuring just and reasonable prices of wholesale electricity, and with regulating and policing the wholesale electricity markets established to advance the Commission's core statutory mission.

### B.  Respondents

8.      Respondent Coaltrain Energy L.P. is a limited partnership formed in January 2009 and organized under the laws of the State of Delaware, whose offices were located at 290 Shisler Ct., Newark, DE 19072 until approximately August 1, 2010, and afterwards at 1619 New London Rd., Landenberg, PA 19350.  The general partner in Coaltrain Energy L.P. is a limited liability company (residing at the same address) called Coaltrain Energy, LLC, and the limited partners are Peter Jones and Shawn Sheehan, who also are the managing members of Coaltrain Energy, LLC.  Coaltrain Energy L.P. was actively engaged in energy trading in the market operated by PJM Interconnection, LLC ("PJM") until April 2011, when Peter Jones and Shawn Sheehan closed the company and "withdrew more than $33 million from the company, leaving the company with few remaining assets."  Order at P 12.  Coaltrain was a licensed "Seller" under Commission rules from March 31, 2009 until April 15, 2011.  Order at PP 10 n.16 and 35 n.72.

9.      Respondent Peter Jones is a U.S. Citizen and resident of Greenville, Delaware.  He has been trading UTCs since approximately 2001, and was a co-owner of Coaltrain.  Order at P 11.

10.      Respondent Shawn Sheehan is a U.S. Citizen and has been a resident of St. Thomas, U.S. Virgin Islands since approximately 2012.  He has continuously worked as an energy trader since 2000, and was a co-owner of Coaltrain.  Order at P 11.

11.      Respondent Robert Jones is a U.S. Citizen and a resident of Newark, Delaware.  He joined Coaltrain and its predecessor company in 2008 and worked as an energy trader in the market operated by PJM for Coaltrain in 2010.  Order at P 11.

12.      Respondent Jeff Miller is a U.S. Citizen and a resident of Kennett Square, Pennsylvania.  He joined Coaltrain and its predecessor company in 2007, and worked as an energy trader in the PJM market for Coaltrain in 2010.  Order at P 11.

13.      Respondent Jack Wells is a U.S. Citizen and a resident of Newark, Delaware.  He joined Coaltrain and its predecessor company in 2008 and worked as an energy trader in the PJM market for Coaltrain in 2010.  Order at P 11.

## JURISDICTION AND VENUE

14.      This Court has subject matter jurisdiction over this action pursuant to FPA section 31(d)(3), 16 U.S.C. § 823b(d)(3)(B); FPA section 317, 16 U.S.C. § 825p; and 28 U.S.C. § 1331.  This Court has personal jurisdiction over each of the Respondents pursuant to Fed. R. Civ. P. 4(k)(1)(C) because FPA section 317, 16 U.S.C. § 825p (2012), provides for nationwide service of process and therefore satisfies this subdivision of Rule

4, which provides that "[s]erving a summons or filing a waiver of service establishes personal jurisdiction over a defendant . . . when authorized by a federal statute."

15.     Venue properly lies in this District pursuant to FPA section 317, 16 U.S.C. § 825p, which provides that "[a]ny suit or action to enforce any liability or duty created by . . . this Act, or any rule, regulation, or order thereunder may be brought in [the district wherein any act or transaction constituting the violation occurred] or in the district wherein the defendant is an inhabitant . . . ."  Here, many of the acts or transactions constituting the violations occurred in this District:

(1)     Respondents' manipulative trading scheme defrauded PJM, whose coverage area includes the Southern District of Ohio;

(2)     the majority of Respondents' manipulative trades that had the potential to affect the wholesale price of electricity were placed at specific locations within this District;

(3)     to effectuate their manipulative trading scheme, a large volume of Respondents' transmission reservations were placed on paths that started or ended at places within this District;

(4)     many of the rest of Respondents' transmission reservations were placed on paths that entered, exited, or crossed through this District; and

(5)     the manipulative trading scheme deceived PJM into paying money to Respondents that otherwise would have gone to other market participants, and as a result entities operating or headquartered in this District— including American Electric Power ("AEP"), American Municipal Power, and Dayton Power & Light—lost approximately $1.4 million, and Ohio consumers were harmed because they would have received some of this money under state law and regulations.

## THE COMMISSION'S ANTI-MANIPULATION AUTHORITY

16.     The Commission's core statutory mission under the FPA is to ensure that the prices (or "rates") for the transmission and sale of electric energy at wholesale in interstate commerce are just and reasonable and not unduly discriminatory or preferential.

7

16 U.S.C. §§ 824, 824d. For most of its history, the Commission discharged its core responsibility to ensure just and reasonable rates by engaging in cost-based ratemaking.

17. Starting in the 1980s, the Commission began to deregulate the natural gas and power markets on the understanding that, if there is a free and properly functioning market, the fair market price would constitute the "just and reasonable" rate. The Commission therefore adopted policies designed to create circumstances under which rates for jurisdictional sales of electricity were set by market forces of supply and demand, rather than through cost-of-service ratemaking. This move toward market-based rates reflected the Commission's attempt to better effectuate its core mission of ensuring just and reasonable rates.

18. The introduction of markets also created new incentives and opportunities for fraud. Starting in the late 1990s and peaking in 2000-01, certain market participants such as Enron found ways (as the Commission later discovered) to manipulate these markets. During the "Western Energy Crisis" of 2000-01, the price of electricity spiked dramatically, particularly in California, as a result of this manipulative activity.

19. The Commission later discovered that the Western Energy Crisis arose when certain market participants found ways to manipulate the new markets by, *inter alia*, exploiting gaps in market rules. The Commission determined that these trading strategies—or "gaming practices," as they became known—resulted in rates that were not just and reasonable. To combat this sort of market manipulation, the Commission established a set of Market Behavior Rules for sellers with market-based rate authority ("Sellers") pursuant to the Commission's duty to ensure just and reasonable rates.

8

Among these was Market Behavior Rule No. 3 that prohibited Sellers from making false or misleading statements to, *inter alia*, the Commission (codified at 18 C.F.R. § 35.41(b)), and Market Behavior Rule No. 2, an explicit anti-manipulation rule that prohibited "acts or transactions that are without a legitimate business purpose and that are intended to or foreseeably could manipulate market prices, market conditions, or market rules for electric energy or electricity products." *Investigation of Terms and Conditions of Public Utility Market-Based Rate Authorizations*, 105 FERC ¶ 61,218 (2003).

20.     Congress also took action in the wake of the Western Energy Crisis. The Energy Policy Act of 2005, Pub. L. 109-58 ("EPAct 2005") added to the Commission's then-existing anti-manipulation authority by amending the FPA to give the Commission at least two new enforcement tools. First, EPAct 2005 gave the Commission authority to assess substantial ($1 million per violation per day) civil penalties against those who violate the relevant portion of the FPA and the rules, regulations, and orders thereunder. FPA section 316A, 16 U.S.C. § 825*o*-1. Second, EPAct 2005 provided the Commission additional authority to prohibit market manipulation. In relevant part, it added FPA section 222, 16 U.S.C. § 824v(a), which makes it "unlawful for any entity . . . directly or indirectly, to use or employ, in connection with the purchase or sale of electric energy . . . any manipulative or deceptive device or contrivance (as those terms are used in section 10(b) of the Securities Exchange Act of 1934) . . . in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of electric ratepayers."

21.    After EPAct 2005, the Commission promulgated the Anti-Manipulation Rule, 18 C.F.R. § 1c.2 (2015), which prohibits an entity from (1)(a) using a fraudulent device, scheme, or artifice, or (b) making a material misrepresentation or a material omission as to which there is a duty to speak under a Commission-filed tariff, Commission order, rule, or regulation, or (c) engaging in any act, practice, or course of business that operates or would operate as a fraud or deceit upon any entity; (2) with the requisite scienter; (3) in connection with the purchase or sale of electricity subject to the jurisdiction of the Commission. *Prohibition of Energy Market Manipulation, Order No. 670*, FERC Stats. & Regs. ¶ 31,202, at P 49 (2006) ("Order No. 670").

22.    Order No. 670 also made it clear that the new rule incorporated both the new EPAct 2005 authority and the Commission's pre-existing prohibitions under Market Behavior Rule No. 2.  Order No. 670 at P 59.  In that order, the Commission stated that it "defines fraud generally, that is, to include any action, transaction, or conspiracy for the purpose of impairing, obstructing, or defeating a well-functioning market.  Fraud is a question of fact that is to be determined by all the circumstances of a case." *Id*. P 50. Thus, the market was on notice that the Commission's anti-manipulation authority would be directed at conduct that subverted the market's function of producing just and reasonable rates.

23.    In assessing penalties pursuant to FPA section 316A, the Commission is directed to consider "the seriousness of the violation and the effort of such person to remedy the violation in a timely manner."  16 U.S.C. § 825*o*-1(b).  In 2008, the Commission adopted a policy that it would consider five factors to determine the

appropriate amount of the civil penalty for violations: (1) seriousness of the offense;
(2) commitment to compliance; (3) self-reporting; (4) cooperation; and (5) reliance on
prior Enforcement guidance. *Enforcement of Statutes, Regulations & Orders*, 123 FERC
¶ 61,156, at PP 54-71 (2008) ("Revised Policy Statement on Enforcement").

## PJM MARKET BACKGROUND

### A.    PJM

24.    PJM, a nonprofit organization, is one of several Commission-regulated
Regional Transmission Organizations ("RTOs") and Independent System Operators
("ISOs").  These entities operate wholesale electricity markets that balance the minute-
by-minute supply and demand requirements for electric power across their regions.  PJM
operates the largest RTO in the nation, covering 13 states extending from Illinois to New
Jersey to North Carolina to Tennessee and Kentucky.  Order at P 13.  All of the Southern
District of Ohio is covered by PJM today; in 2010, the area around Cincinnati had yet to
join PJM, while the area served by AEP, American Municipal Power, and Dayton Power
& Light, including Columbus, were part of PJM in 2010.

25.    As the Commission requires, PJM has an independent watchdog unit, called
an Independent Market Monitor or IMM, that, among other responsibilities, seeks to
detect (and to alert the Commission to) improper conduct by market participants.

26.    PJM uses market-based systems to provide electricity at the lowest possible
cost consistent with maintaining the reliable operation of the grid.  "Electricity prices in
PJM vary based on the specific location, or node, within the market."  Order at P 13.
There are thousands of nodes within PJM, including many in this District.  Because

11

prices vary by location, market prices for energy at particular nodes are called "Locational Marginal Prices," or LMPs.  *Id*.  LMPs consist of three elements:  (i) a basic energy price (which is the same at every node); (ii) the cost of congestion (which varies at each node depending on the limitations of the transmission system); and (iii) the cost of line losses (which are central to this proceeding, and which represent the amount of electricity lost as heat during transmission).  *Id.*

27.     PJM operates both a day-ahead market and a real-time market.  In the day-ahead market, market participants engage in transactions involving energy that will flow through power lines the following day.  In the real-time market, market participants engage in transactions involving energy that will flow through power lines the same day.  Order at P 14.

28.     In addition to physical transactions, which involve the delivery or scheduled delivery of electricity, the Commission also authorizes PJM and other organized markets to offer various "virtual" products, which are financial trades for which no generation is dispatched, no load is served, and obligations are met through cash settlement.  Although "virtual products carry no obligation to buy or sell physical power, they serve a direct role in day-ahead price formation as reflected in day-ahead LMPs."  Order at P 15.  In particular, virtual products can "(i) be the price setting marginal factor in determining day-ahead LMPs; (ii) affect day-ahead dispatch; and (iii) affect other market participant positions."  *Id*.  In short, virtual trading products are integrated into, and therefore affect, the price of electricity in the node or region where the trade takes place, as well as what generation units are dispatched by PJM to provide

energy to the wholesale grid.  *Id.* P 18.  Virtual trades are allowed in wholesale electricity markets because they "can promote market efficiency" and "increase[] market liquidity and [create] price convergence between the day-ahead and real-time markets."  *Id.*

## B.   UTC Trading

29.     The specific financial instrument at issue in this matter is called "Up-To Congestion" ("UTC").  A UTC is "a type of spread trade that allows market participants to arbitrage the difference between day-ahead and real-time [prices] at two different locations."  Order at P 3.  UTCs were initially created as a tool for traders of physical electricity to hedge congestion price risk associated with physical transactions, and "later became a way for market participants to profit by arbitraging the price differences between two nodes in the day-ahead and real-time markets."  *Id.* P 16.  Virtual traders such as Coaltrain "use [UTC trades] as a 'purely virtual product' …. to take on directional price risk related to the differences between LMP in the day-ahead and real-time markets."  *Id.* P 17.  As the Commission explained in 2008, "'[u]nder an Up-To congestion price arrangement, arbitrageurs may sell power at point A and buy power at point B in the [d]ay-ahead market ….  If during the [r]eal-[t]ime market, the spread between those points increases, the arbitrageur makes money; if the spread decreases, it loses money.'"  *Id.* (quoting *Black Oak Energy, L.L.C. v. PJM Interconnection, L.L.C.*, 122 FERC ¶ 61,208, at n.85 (2008)).  That is, in UTC transactions, virtual traders try to profit by accurately predicting whether the difference (or spread) between the prices at two nodes will widen or narrow between the day-ahead and real-time markets.

13

30.     At the time of the manipulative trading at issue here, traders also had to reserve transmission in the day-ahead market in order to do their UTC trades. Order at P 20. This involved selecting a transmission "path" linking two points on the map (from a "Point of Receipt" to a "Point of Delivery"), but the transmission points did not have to perfectly match the UTC pair of nodes. *Id.* During the summer of 2010, virtual traders could obtain transmission without paying for it by a number of means, including by exporting from PJM into the region operated by the neighboring RTO called the Midcontinent Independent System Operator, Inc. ("MISO"). Otherwise, traders had to pay a sum—typically 67 cents per MWh—to reserve non-firm hourly transmission. These fees increased the transaction costs of doing UTC trades. However, traders such as Respondents knew how to avoid or reduce their transmission reservation charges.

31.     Because there was a finite amount of transmission, making such reservations for financial trades prevented other market participants from using that transmission in the day-ahead market unless PJM re-released it into the day-ahead market later in the trading day.

### C.     Marginal Loss Surplus Allocation ("MLSA")

32.     At the time of the manipulative trades at issue here, all physical and UTC transactions using paid transmission were eligible to receive a *pro rata* portion of Marginal Loss Surplus Allocation ("MLSA") payments. Order at P 21. MLSA is a credit distributed to market participants because, to send appropriate price signals, PJM collects too much money for transmission line losses. *Id.*

14

33.     Transmission line losses arise because some electricity transmitted over a power line is lost in the form of heat.  The farther electricity travels on a line, the more electricity is lost.  To compensate generators for electricity lost during transmission, PJM charges line losses as one component of the LMP.  In calculating line losses, PJM sets the price at the marginal, rather than average, cost.  As a result, PJM collects more in line losses than it distributes to generators.  Order at P 22.  The resulting surplus is distributed as MLSA.

34.     Once PJM began collecting a surplus, the next question was what to do with it.  At first, PJM distributed MLSA only to physical trades.  In September 2009, the Commission accepted PJM's proposal to begin distributing MLSA on a per-MWh *pro rata* basis to all market participants that contributed to the cost of maintaining the transmission system.  Order at P 23 (citing *Black Oak Energy, L.L.C. v. PJM Interconnection, L.L.C.*, 128 FERC ¶ 61,262 (2009)).  This meant that MLSA would be distributed to UTCs that used paid transmission, but not to UTCs that used free transmission (*i.e.*, trades that exported from PJM to MISO).  Under this method of distribution, PJM determined for each hour of the day the number of MWh of eligible trades, and divided the surplus collected that hour equally among them.  *Id.* P 24.  Thus, as a market participant's volume of MLSA-eligible trades increased, its share of available MLSA payments also increased.  *Id.*

## PJM AND THE MARKET MONITOR DISCOVER THE SCHEME

35.     Starting in late July August 2010, PJM and its market monitor discovered that a small number of traders, Respondents among them, had devised and executed

schemes to take advantage of PJM's trading rules by making large-volume UTC trades that could not profit from price spreads, thereby causing PJM to make larger MLSA payments to them (paid on a volumetric (per-MWh) basis).

36.    As Enforcement later learned, Respondents called this the "OCL Strategy" in their internal records ("OCL" means "Over-Collected Losses," which was what Respondents sometimes called MLSA), and between June and September 2010 they tagged all of their UTC trades with either the "OCL Strategy" label (for trades that solely or primarily targeted MLSA payments) or the "Spread Strategy" label (for trades that solely or primarily were done to profit from price spread arbitrage).

37.    Upon discovering Respondents' two most lucrative OCL Strategy paths (SouthImp-Exp and NCMPAImp-Exp) in late July 2010, the IMM asked Respondents to stop trading on those paths.  Respondents complied, but Enforcement later discovered that Respondents simply shifted to other OCL trades.

38.    In early August 2010, PJM and the IMM conducted meetings with market participants in which it was made plain that schemes to trade UTCs to collect MLSA were wrongful.  On August 18, 2010, PJM submitted a request to the Commission to amend its tariff to prevent the UTC market manipulation from recurring.  On September 17, 2010, the Commission approved PJM's revisions to its tariff.  *PJM Interconnection, L.L.C.*, 132 FERC ¶ 61,244 (2010).

## ENFORCEMENT'S INVESTIGATION

39.    Shortly after discovering the scheme, PJM and the IMM referred this matter to the Commission.  Subsequently, Enforcement began an investigation, during which it

16

issued multiple data requests and subpoenas, and took testimony from each of the individual Respondents.

40.     In November 2010, Enforcement issued its Second Data Request asking Coaltrain to produce, *inter alia*, copies of all documents and communications relating to the company's UTC trading and strategy.  In response, the company produced some documents, and Peter Jones (the co-owner) attested that the company's response was "true, complete, and accurate."

41.     In June 2012, Enforcement discovered from a former Coaltrain employee that in 2010 the company had used a computer security monitoring software program that recorded every single keystroke made on employees' work and home computers and also captured a screenshot image of every monitor on affected computers approximately every 20 seconds.  When Enforcement asked Coaltrain about this software, which was called "Spector 360," the company at first claimed that it could not review or produce the recordings.  The company produced the recordings only after Enforcement procured a renewed license for the software.  Enforcement later discovered that Coaltrain had, in fact, been able to access and review the Spector 360 documents in early July 2012— *before* it falsely told Enforcement that it could not.

42.     This software's recordings provided crucial evidence in the investigation.

43.     On September 25, 2014, pursuant to the Commission's policies, Enforcement sent a 48-page letter to Respondents detailing Enforcement's preliminary findings that Respondents had violated the Anti-Manipulation Rule through its UTC

17

trades and that Coaltrain had made false and misleading statements and material omissions ("Preliminary Findings letter").

44.     On May 15, 2015, Respondents submitted three separate responses (totaling approximately 200 pages) to the Preliminary Findings letter.  These responses included a lengthy expert report.  On September 10, 2015, Respondents and their expert presented an oral supplemental response to the Preliminary Findings letter, and they submitted a 14-page written supplement the next day.

45.     On September 11, 2015, pursuant to the Commission's rules and policies, the Commission issued a public Notice of Alleged Violations briefly summarizing Enforcement's allegations against the Respondents.

46.     On September 18, 2015, Enforcement issued a letter to Respondents pursuant to 18 C.F.R. § 1b.19 ("1b.19 letter"), notifying them that Enforcement intended to recommend that the Commission issue an Order to Show Cause.  The 1b.19 letter also informed the Respondents that their responses would be submitted to the Commission at the same time as Enforcement's ultimate recommendation.

47.     On October 19, 2015, Respondents submitted separate responses to the 1b.19 letter.  These responses also attached copies of Respondents' responses to the Preliminary Findings letter, including their expert report.

48.     Enforcement subsequently submitted its recommendation, along with Respondents' responses to the 1b.19 letter (including all attachments), to the Commission.

## THE COMMISSION'S SHOW CAUSE PROCEEDING

49.     On January 6, 2016, pursuant to FPA section 316A, 16 U.S.C. § 825*o*-1, the Commission provided Respondents with notice and opportunity for a public hearing by issuing an Order to Show Cause and Notice of Proposed Penalty that attached a report by Enforcement alleging that (i) Respondents had devised and executed a scheme to manipulate and defraud the wholesale energy markets, and (ii) Coaltrain had made false and misleading statements and material omissions.

50.     On February 5, 2016, Respondents waived their opportunity for a formal public hearing on the record before an Administrative Law Judge governed by the APA. They did so pursuant to FPA section 31(d)(3), 16 U.S.C. § 823b(d)(3), which authorizes respondents to opt for an abbreviated procedure in which the Commission determines whether a violation occurred and whether to assess penalties after reviewing the written pleadings and administrative record.  However, the Commission may not enforce penalties assessed under this provision unless the respondents fail to pay the penalties and then a district court reviews and affirms the order assessing penalties.  In conducting this review proceeding, the district court "shall have the authority to review de novo the law and the facts involved, and shall have jurisdiction to enter a judgment enforcing, modifying and enforcing as so modified, or setting aside in whole or in [p]art, such assessment." *Id.*

51.     On March 4, 2016, Respondents submitted their Answers to the Order to Show Cause.  These Answers added up to more than 450 pages of legal and fact argument, and included another expert report as well as affidavits from each of the

19

individual Respondents.  On April 1, 2016, Enforcement submitted a reply to Respondents Answers.

52.     On May 27, 2016, after reviewing the record and the parties' submissions, the Commission issued the Order Assessing Penalties, finding that each of the Respondents participated in an unlawful manipulative trading scheme, and that Coaltrain made false and misleading statements and material omissions.

53.     After finding these violations, and pursuant to its authority under FPA section 316A, 16 U.S.C. § 825$o$-1, the Commission assessed civil penalties against the Respondents in the amount of $26 million against Coaltrain (jointly and severally with Peter Jones and Shawn Sheehan), $5 million each against Peter Jones and Shawn Sheehan, $1 million against Robert Jones, and $500,000 each against Jack Wells and Jeff Miller.  The Commission further determined that Coaltrain, Peter Jones, and Shawn Sheehan should jointly and severally be disgorged of unjust profits in the amount of $4,121,894, plus applicable interest.

54.     The Order discusses the relevant facts in detail, considers and evaluates the arguments made by Respondents in their lengthy written submissions, cites to pertinent record evidence, and applies the Commission's own rules and precedents to Respondents' conduct.  Among other things, the Commission quotes and relies on many contemporaneous communications and screenshots in which Respondents planned and executed the OCL Strategy.  In the next section, we summarize the Commission's principal findings in the Order Assessing Civil Penalties.

## THE COMMISSION'S FINDINGS

**A.     Respondents' Manipulative OCL Strategy**

**1.     Overview**

55.     The Commission found that Respondents knew that UTC trades were designed to profit from price-spread arbitrage and knew that UTC trades were designed to allow traders to profit from price-based arbitrage.  Order at P 37.  For several years before the summer of 2010, Respondents successfully traded in accordance with this purpose through legitimate trades that they referred to as their "Spread Strategy" trades. *Id.*

56.     Respondents' legitimate Spread Strategy analyzed constraints in the system (such as out-of-service transmission lines), which create a difference in price between nodes and thus create an opportunity to profit from arbitrage.  Order at P 38. Respondents were very successful in this, earning millions of dollars by correctly predicting how prices changed.

57.     Respondents further increased the profits from their Spread Strategy trades by reducing their transaction costs.  One of their methods was to acquire "free" transmission by associating their trade with a transmission reservation from PJM to MISO.  Another was to "overschedule" transmission, in which they made more MWhs of UTC trades than the MWh volume of their transmission reservations.  Order at P 39. However, any UTC trades not associated with paid transmission were not eligible for MLSA.

58. During the Manipulation Period (June-September 2010), the Commission found that Respondents continued to execute legitimate Spread Strategy trades in addition to their manipulative ones.

59. The Commission also found that, between June and September 2010, Respondents devised and executed a new and entirely different UTC trading strategy. They called this new strategy the "OCL Strategy," the "sole or primary purpose" of which was to "collect[] MLSA payments." Order at P 41. The Commission found that the OCL Strategy constituted market manipulation.

60. In early June, Respondents began formulating a strategy to target and profit from MLSA payments. Order at P 107. Coaltrain's Chief Financial Officer downloaded MLSA data just days after the release of a June 1, 2010 PJM report that highlighted how much MLSA had been distributed. *Id.* P 108. On June 7, 2010, Shawn Sheehan exchanged a series of instant messages with an employee to discuss MLSA. *Id.* P 41. That same day, Coaltrain employees performed an analysis showing that the company "would have made more money had they voluntarily increased their transmission costs in order to be eligible for MLSA payments." *Id.* P 42. In so doing, the analyst compared "Losses Missed" (*i.e.* MLSA missed) and "Trans[mission] Saved," (*i.e.* the fees for reserving transmission saved), thereby demonstrating Respondents' interest in pursuing MLSA and their desire to implement a scheme to capture MLSA payments. *Id.* P 108. The company's lead analyst designed a software tool to find and analyze potential OCL trades that same day. *Id.* Also that same day, Jeff Miller performed several Google

22

searches for the term "OCL." *Id.* P 41. Robert Jones later recalled discussing and researching MLSA in early June 2010 as well. *Id.* P 41.

61. The Commission found that the new OCL Strategy solely or primarily targeted ways in which the firm could profit from MLSA payments rather than from price arbitrage. For instance, on June 10, 2010, Shawn Sheehan and Jeff Miller exchanged instant messages to discuss the OCL Strategy that Respondents were devising; demonstrating that Respondents knew that the OCL Strategy was entirely different from the legitimate Spread Strategy, that the new strategy was not (in their words) "'strictly an upto,'" and that it was intended to make money by targeting MLSA payments. Order at PP 112-13. Further evidencing their intent, on June 15, 2010, the firm's lead analyst wrote "'create application to find deals for loss credits'" in a software tool used for task management. *Id.* P 42. "Loss credits" is another term for MLSA.

62. Unlike legitimate Spread Strategy trades "which principally relied on constraint analyses to identify opportunity to profit from arbitraging price differences" caused by congestion on the power grid, the OCL Strategy trades were, as Respondent Jack Wells later testified, "'not really congestion-based trades.'" Order at P 45. The OCL Trades instead "focused on paths with little or no price spread between the day-ahead and real-time market" and relied on what Respondents called "secondary constraints" that "were not created to identify congestion" but rather "to identify paths with little or no changes in price." *Id.* P 45.

63. The Commission also noted that Respondents voluntarily increased their transaction costs on the OCL Trades by paying to reserve transmission when it was not

necessary to do so, which is not consistent with attempting to profit from trade fundamentals, but it was consistent with ensuring eligibility for MLSA payments. Order at P 46.

64.     The Commission found the Respondents made three categories of manipulative trades pursuant to their OCL Strategy: (1) trades between two interface nodes called SouthImp and SouthExp that never experienced any price spread during the six weeks while Respondents traded on this path ("SouthImp-Exp"), Order at PP 49-52; (2) trades between two interface nodes called NCMPAImp and NCMPAExp that earned only 11 cents per MWh on price spreads when Respondents traded it, but lost about 71 cents per MWh after deducting transaction costs ("NCMPAImp-Exp"), *id.* PP 53-58; and (3) trades made on 38 other OCL paths that on average lost 30 cents per MWh on price spreads and even more money after deducting transaction costs ("Other OCL Trades"), *id.* PP 59-61. Each category will be discussed in greater detail below.

65.     As in two other recent penalty orders involving manipulative UTC schemes similar to Respondents' OCL Strategy (*Chen*, 151 FERC ¶ 61,179 (2015) ("*Chen*"), and *City Power*, 152 FERC ¶ 61,012 (2015) ("*City Power*")), the Commission stated that "'the UTC products' history and purpose demonstrate that engaging in … UTC trades with the MLSA payments as the sole or primary price signal is improper. Speculative UTC trades placed to arbitrage price spreads will have as their sole or primary price signal the price risk of the underlying UTC spread and will be placed with the purpose of profiting based on the direction of the spread.'" Order at P 103 (quoting *Chen*, 151 FERC ¶ 61,179 at P 80; *City Power*, 152 FERC ¶ 61,012 at P 103). The Commission

24

found that "the OCL Strategy was fraudulent, inconsistent with non-manipulative trading patterns, uneconomic, inconsistent with the fundamentals of supply and demand, contrary to the PJM UTC market designed purpose, and deceptive." *Id.* P 115. Therefore the OCL Strategy constituted "a scheme to defraud the PJM market by trading UTCs with MLSA payments as their sole or primary price signal [and it is] the same scheme considered in [*Chen* and *City Power*] and the manner in which Respondents pursued that scheme is substantially similar to the schemes at issue in those orders." *Id.* P 102. In sum, the Commission found that "the evidence demonstrates that Respondents engaged in their OCL Strategy not to hedge or arbitrage price spreads but instead to receive large shares of MLSA payments that otherwise would have been allocated to other market participants. Moreover, Respondents' high volumes of OCL Trades had wide ranging impacts on the market." *Id.* P 101.

### 2. Respondents' Three Categories of OCL Strategy Trading

#### a. SouthImp-SouthExp

66. The Commission found that Respondents' largest category of OCL Strategy trades were placed between the SouthImp and SouthExp interfaces between mid-June and late July. The SouthImp-Exp trades always had a zero price spread when Respondents traded on the path (which they anticipated); they knew they could do the trade using free transmission but decided to pay for it anyway; and despite losing money on every SouthImp-Exp trade, they increased their volume and did their trades almost every day until PJM's market monitor asked them to stop. Order at P 116. The Commission

therefore found that Respondents' purpose in doing the SouthImp-Exp trades was to collect MLSA payments, not to profit from arbitrage. *Id.*

67. Respondents, who had never traded on SouthImp-Exp prior to the OCL Strategy, executed 6,612 OCL trades on this path over 34 days in June-July 2010 for a total volume of approximately 2.81 million MWh. They used paid transmission for all SouthImp-Exp trades (except when, by their own admission, they mistakenly traded using free transmission on two days in June) and they earned $0 on the price spread on every one of those transactions. They also lost $2.43 million in transaction costs, but later received $5.07 million in MLSA payments attributable to that volume, for a total net profit of approximately $2.6 million. Order at P 51.

68. The Commission carefully analyzed the evidence and found that the SouthImp-Exp trades bore the indicia of fraud and were manipulative. First, the Commission found that the evidence shows that SouthImp-Exp trades were part of a scheme to defraud. In particular, the Commission found that Respondents knew from the price history on SouthImp-Exp that it was not likely to make a profit, that the evidence shows they specifically targeted SouthImp-Exp because of its zero price spread history, and yet they continued to make daily large-volume trades on the path even though they never once experienced a non-zero price spread—and in fact they increased their volume despite their consistent losses. Order at PP 122-27.

69. Second, the Commission also found that the pattern of SouthImp-Exp trades reflected their fraudulent purpose. Order at P 131. Unlike their Spread Strategy trades, Respondents voluntarily increased their transaction costs by paying to reserve

26

transmission when they knew they did not have to do so, and Respondents' purpose for reserving transmission unnecessarily was to maximize their share of MLSA payments. *Id.* The volume of the Spread Strategy trades was lower than for SouthImp-Exp, reflecting the fact that there was significant price risk on the Spread Strategy trades while the OCL trades such as SouthImp-Exp were "wholly dependent for their profitability on the MLSA." *Id.* P 132.

70.     Third, the Commission also found that the SouthImp-Exp trades were uneconomic because they were routinely unprofitable when measured from a price arbitrage perspective. Order at P 139. Respondents knew or discovered that the trades had no substantive economic risk, and so they correctly expected zero-spread results. Order at P 135. The purpose was to collect MLSA, but the Commission held that "'MLSA payments were not, and should not be considered, part of the underlying UTC trade… UTCs were created as a tool for hedging congestion price risk associated with physical transactions, and later became a way for market participants to profit by arbitraging the price differences between two nodes in the day-ahead and real-time markets.'" *Id.* P 137. The Commission also found that the SouthImp-Exp trades were inconsistent with the fundamentals of supply and demand, in part because SouthImp and SouthExp had been defined by PJM as mathematically equivalent since 2007, and the occasions when a price divergence did appear were rare and "almost always small and negative." *Id.* This price history led the Commission to "conclude there was no rational reason to expect the SouthImp-Exp trade to profit from an arbitrage perspective." *Id.*

27

71.     Finally, the Commission found that the SouthImp-Exp trades were deceptive.  As Respondents knew, the market purpose behind UTC trades was to permit traders to arbitrage price spreads in the market by identifying times when they believed a divergence would occur.  Order at P 144.  But Respondents placed the SouthImp-Exp trades knowing that there would likely be a zero price spread—and greatly increased their trading frequency and volume on the path despite never once capturing a non-zero price spread—solely or primarily to profit from MLSA.  The nature and purpose of the SouthImp-Exp trades was therefore "concealed and created the illusion of arbitrage trading between these points thereby subverting the PJM market." *Id.*  In so doing, Respondents "defrauded PJM into allocating MLSA payments to Respondents by engaging in high volumes of fraudulent zero-spread UTC trades solely or primarily to collect MLSA payments." *Id.*

72.     The Commission also found that Respondents knew their OCL Strategy was manipulative, as further demonstrated by statements made in a public submission to the Commission dated June 9, 2010 that Coaltrain co-signed.  Order at P 199.

### b.     NCMPAImp-NCMPAExp

73.     The Commission found that Respondents' second-largest (by volume) category of OCL Strategy trades were between NCMPAImp and NCMPAExp.  Respondents first discovered NCMPAImp-Exp in mid-June 2010, but did not make their first trade on the path until early July when they made some "test" trades.  Order at PP 54-56.  After these test trades proved successful, Respondents began making large-volume trades on the path in mid-July, trading on 17 days.  *Id.* P 55.  During the last four

28

days of July, they greatly increased their trading volume on NCMPAImp-Exp after

PJM's market monitor asked them to stop making their SouthImp-Exp trades. *Id.* PP 57,

157. Respondents continued making trades on NCMPAImp-Exp until July 31, 2010,

when PJM's market monitor called to ask them to stop those trades as well. *Id.* PP 57-58.

74. While Respondents' NCMPAImp-Exp trades made an insignificant gain on

the spread of 11 cents per MWh, this was far less than the 89 cent per-MWh average

transaction cost of doing UTC trades, including the cost of reserving transmission. Order

PP 145, 147. Respondents executed approximately 1.088 million MWh of NCMPAImp-

Exp trades, averaging 660 MWh per trade (far higher than their per-trade average for the

Spread Strategy), and used paid transmission for all of the trades (after the "test" trades),

while they paid for transmission for only 18 percent of their legitimate Spread trades

done at the same time. *Id.* P 57. They lost approximately $0.71 per MWh after

deducting $893,000 in transaction costs (including voluntary payments to reserve

transmission), as against a $0.62 per MWh profit from their Spread trades. *Id.*

Respondents received approximately $1.79 million in MLSA payments for the volumes

attributable to the volumes of these trades, and obtained thereby a net profit of

approximately $1.02 million despite losing more than $700,000 on NCMPAImp-Exp

price spreads and transaction costs. *Id.* PP 57, 147.

75. The Commission determined that the NCMPAImp-Exp trades were

uneconomic and motivated by Respondents' fraudulent intent to further their scheme to

collect MLSA payments. Order at P 148. First, the Commission found that Respondents

uncovered the NCMPAImp-Exp path as part of their efforts to analyze, select, and target

29

trades for their OCL Strategy with zero or near-zero price spreads. *Id.* P 149. Coaltrain's lead analyst discovered the trade while researching UTC paths with consistently low price spreads, and his analysis showed that, at that time, the trade averaged a loss of $0.03 per MWh on price spreads alone (and far more once transaction costs are deducted). *Id.* Before placing the trades, Robert Jones analyzed the path and at that time also found an average price spread which was far less than transaction costs. *Id.* P 151. Respondents' test trades used free transmission, demonstrating they knew they did not have to pay for transmission. *Id.*

76.    Respondents argued that they intended to try to profit from price spreads when trading NCMPAImp-Exp. The Commission reviewed the evidence and rejected that contention, finding instead that Respondents wanted to avoid constraints when making that trade. Order at PP 153-54. During the time when they made the trades, Respondents never once experienced a profitable price spread after deducting transaction costs. *Id.* P 155. Despite this, Respondents continually increased their trading volume. *Id.* P 156. After PJM's market monitor asked them to stop trading SouthImp-Exp, they responded by substantially increasing their trading volume on NCMPAImp-Exp. *Id.* P 156. The Commission concluded that Respondents did so to make up for the loss of the MLSA they had been receiving for SouthImp-Exp. *Id.*

77.    Second, the Commission held that the timing of the NCMPAImp-Exp trades reflected their fraudulent nature. Order at P 158. Respondents did not trade on the path until after they began focusing on finding ways to capture more MLSA payments, and they voluntarily used paid transmission for all of their NCMPAImp-Exp trades

30

(except for the small test trades). *Id.* P 159. The volume of their NCMPAImp-Exp trades exceeded that of their non-manipulative Spread Strategy trades, and they used far less paid transmission (and made far more money from price spreads) on the Spread Strategy trades than they did on NCMPAImp-Exp. *Id.* PP 159-161.

78. Third, the Commission also found that the NCMPAImp-Exp trades were uneconomic because they did not make (or expect to make) a profit from price spreads after deducting transaction costs. Order at PP 163-64. Since the trades were uneconomic, the Commission determined that the sole or primary purpose for trading such large volumes on the path was to increase MLSA payments. *Id.* PP 164-66. Similarly, the NCMPAImp-Exp trades were inconsistent with the market fundamentals of supply and demand. *Id.* P 167. The Commission found that the trade's poor performance on price spreads was not only expected, but was in fact the reason why Respondents picked the trade. *Id.*

79. Finally, the Commission also found that Respondents' NCMPAImp-Exp trades were deceptive because the trades were done with MLSA as the sole or primary price signal, not price spread arbitrage, and they tried to conceal the nature and purpose of their trading scheme. Order at P 168.

### c.      38 Other OCL Strategy Paths

80. The Commission also found that Respondents made trades on 38 other UTC paths pursuant to the manipulative OCL Strategy ("Other OCL Paths") to achieve their sole or primary purpose of targeting and increasing their share of MLSA payments by minimizing the price spread trading risk associated with UTCs. Order at P 169.

Respondents identified the 38 Other OCL Paths as part of the OCL Strategy by frequently referring to them as "OCL plays" and designating them as "OCL" on internal trade systems, and by voluntarily increasing their transaction costs by using paid transmission for 99 percent (by volume) of the Other OCL Trades to make them eligible for MLSA when it was not necessary to do so.  *Id.* P 170.  Although Respondents started experimenting with these Other OCL Paths before they discovered SouthImp-Exp, they greatly increased their volume of trading on those other paths after they stopped making SouthImp-Exp and NCMPAImp-Exp trades.  *Id.*

81.     The Commission rejected Respondents' contention that the Other OCL Paths were not part of the OCL Strategy because they made trades on some of the paths before and after the Manipulation Period.  Order at P 171.  The Order analyzed the trade data and other evidence before determining that some of the early trades were tests to see whether the OCL Strategy worked, and that others were placed under quantitatively and qualitatively different circumstances pursuant to the Spread Strategy.  *Id.*  The Commission similarly found that the trades made after the scheme ended were not part of the OCL Strategy.  *Id.*

82.     The performance of the Other OCL Trades was similar to SouthImp-Exp and NCMPAImp-Exp:  the trades lost money on price spreads (losing 30 cents per MWh on average) and lost even more money after deducting an average of 89 cents per MWh in transaction costs (including money voluntarily paid to reserve transmission).  Order at P 172.  Respondents' Other OCL Trades lost $221,000 on price spreads and more than $512,000 in transaction costs for a total loss of more than $733,000, but generated

approximately $1.18 million in MLSA payments, and thereby netted unjust profits exceeding $452,000. *Id.*

83. The Commission found that Respondents engaged in a scheme to defraud when they made trades on the 38 Other OCL Paths pursuant to the OCL Strategy. Order at PP 174, 187. Respondents themselves identified the trades as OCL Strategy transactions, and voluntarily paid to reserve transmission to make the trades eligible for MLSA. *Id.* The Commission found ample evidence in the Spector 360 screenshots that the Other OCL Paths were part of the OCL Strategy. *Id.* PP 176-77.

84. The Commission found that the performance of the Other OCL Paths—overall, losing money on spreads—further demonstrates that Respondents made the trades not to profit from price spread arbitrage but rather to collect MLSA payments. Order at P 180. Respondents actually made a tiny profit on two of the 38 OCL paths, but they further showed that the purpose of the trades was to collect MLSA when they decided not to make any more trades on those two paths. Respondents doubled their daily trading volume on the Other OCL Paths in August-September 2010 after the IMM asked them to stop trading on SouthImp-Exp and NCMPAImp-Exp, and they did so as a substitute for those trades, "knowing the IMM's concerns about their MLSA-targeted trading on the SouthImp-Exp and NCMPAImp-Exp paths." *Id.* P 182. The Commission also found that the Other OCL Trades were uneconomic and inconsistent with the market fundamentals of supply and demand. Order at PP 188-92. Uneconomic trading is an "'indicium to be considered among the overall facts that the Commission examines when considering a potential violation of its Anti-Manipulation Rule, but standing alone is

33

neither necessary nor dispositive.'" *Id.* P 190 (quoting *Chen*, 151 FERC ¶ 61,179 at P 77). Finally, the Commission found that Other OCL Trades were deceptive because they were undertaken with intent to collect MLSA rather than to try to profit from price spread arbitrage. *Id.* P 193. Respondents knew that the Other OCL Trades were fraudulent and manipulative, and despite this continued to deceive PJM into giving them MLSA.

### 3. Additional Findings Regarding The Manipulative Scheme

#### a. Respondents Had Notice That Their OCL Strategy Was Fraudulent

85. The Commission found that Respondents had fair notice that placing uneconomic UTC trades solely or primarily to collect MLSA payments violated the FPA and the Anti-Manipulation Rule. Order at P 194. Section 222 of the FPA and the Anti-Manipulation Rule broadly encompass the full and wide variety of fraudulent activity that can occur. *Id.* P 195. The Commission also rejected Respondents' contention that the OCL Strategy falls within the "safe harbor" provided by Order No. 670. *Id.* P 200.

86. The evidence in the record demonstrated that Respondents had actual notice that their scheme was manipulative and fraudulent. In particular, the Commission recited the statements that Coaltrain, in conjunction with three other market participants, made in a June 9, 2010 submission to the Commission regarding MLSA. Order at P 199 (quoting Financial Marketers, *Request for Rehearing*, Docket No. EL10-40-001, at 20 n.23 (filed June 9, 2010) ("June 9, 2010 Submission")). That filing—made at the time when Respondents were planning the OCL Strategy—assured the Commission that paying

34

MLSA to virtual traders would not create "'perverse incentives'" to "'engage in virtual transactions in order to capture a larger share of the surplus [i.e. MLSA]'" and that "'[a]s always, market participants will conduct virtual transactions when they think they can profit from the difference between the day-ahead LMP and the real-time LMP they expect.'"  *Id.* (quoting June 9, 2010 Submission at 20 n.23).  The Commission found that this "demonstrates Respondents recognized products like virtual or UTC trades are to be placed to arbitrage price spreads" and "demonstrates that Respondents were not 'unwary' but informed that their conduct was unlawful."  *Id.*

87.     Finally, the Commission rejected the argument by some of the Respondents that because the market monitor did not immediately call the strategy manipulative, they lacked fair notice.  Order at P 201.  Not only did the Respondents have actual knowledge before they first executed their OCL Strategy that it was fraudulent and manipulative, but the market monitor did not then have full information about Respondents' scheme.  *Id.*

### 4.     Respondents Acted With Scienter

88.     The second element of market manipulation under the FPA and the Anti-Manipulation Rule is scienter, which the Commission defined as requiring "reckless, knowing, or intentional actions taken in conjunction with a fraudulent scheme, material misrepresentation, or material omission."  Order at P 213.  The Order examined the evidence and the parties' arguments, and determined that each of the Respondents acted with scienter when they devised and executed the OCL Strategy.  *Id.* PP 221, 239.

89.     The Commission found that contemporaneous evidence showed that the OCL Strategy's purpose was solely or primarily to target MLSA.  The Commission cited

a series of instant messages exchanged between Shawn Sheehan and Jeff Miller discussing the best way to profit from "OCLs," including how much money to bid on OCL trades, how transmission payments affected OCL Trades, which sources and sinks would work for OCL Trades, and how the "'ocl strategy alone would work better for days when there isn't much congestion.'"  Order at P 222.  The Commission recited other evidence confirming that Respondents intended to target MLSA, such as Coaltrain's lead analyst's writing "'create application to find deals for loss credits'" in an internal task management tool, *id.* P 223; Sheehan's response when learning about SouthImp-Exp that the day-ahead spread was "'perfectly 0,'" *id.* P 224; Robert Jones's statement on July 2, 2010 proposing to conduct a "'meg tester [i.e., test transaction] for a high load/high loss credit day'" on NCMPAImp-Exp, *id.* P 225; and the routine flagging of their trades with the "OCL Strategy" label.  *Id.* P 226.

90.    The Commission also found that Respondents' scienter is reflected in the pattern of their OCL Strategy trading.  Order at P 227.  The Commission concluded, after analyzing the trade data, that Respondents voluntarily increased their transaction costs by paying to reserve transmission even though they knew it was not necessary to do so.  *Id.*

91.    The Commission further found that Respondents attempted to cover up evidence of their conduct by not producing millions of pages of documents responsive to Enforcement's data requests, and instead telling Enforcement that their responses were "true, complete, and accurate."  The Commission found that this attempted cover-up "is a strong indicator of Respondents' manipulative intent."  Order at P 238.

### 5.  The Commission Has Jurisdiction to Impose Penalties Here

92.    The last element of a market manipulation offense is that the conduct must be "in connection with" transmission or a transaction subject to the Commission's jurisdiction."  Order at P 243.  The Commission has jurisdiction over the transmission and sale for resale of electric energy in interstate commerce, including the "responsibility to ensure that rates and charges for transmission and wholesale power sales—and all rules and regulations affecting such rates and charges—are just and reasonable and not unduly discriminatory or preferential," as well as "practices that affect rates."  *Id.* PP 247, 249.  While Respondents did not explicitly challenge jurisdiction, the Commission nevertheless found that that the UTC transactions at issue here are jurisdictional because (a) the transactions were done under PJM's Commission-approved tariff; (b) virtual trades (such as UTCs) are integrated into and therefore affect the market clearing price of energy; (c) the trades also involved the reservation of jurisdictional transmission services within PJM; and (d) Respondents' conduct was also "in connection with" other market participants' jurisdictional transactions "such that the necessary jurisdictional nexus under FPA section 222 is satisfied on this basis."  *Id.* PP 248-51.

### 6.  Each Individual Respondent Carried Out and Participated in a Joint Scheme

93.    The Commission found there is sufficient evidence to show that each individual Respondent participated in a joint, coordinated fraudulent scheme to trade UTCs for the sole or primary purpose of collecting MLSA.  Order at P 252.

94.     Peter Jones "participated in all facets of Respondents' fraudulent OCL Strategy," and he participated in the development of the strategy, including researching and identifying certain UTC paths that were good candidates for the scheme; playing a significant role in executing the strategy, making more than five percent of the trades himself and communicating his approval and instruction for many more; trying to conceal the true nature of the OCL Strategy; and trying to cover up evidence.  Order at P 253.[2]

95.     Shawn Sheehan "played a key role in developing and implementing Respondents' OCL Strategy," and he was "heavily involved in strategizing about, designing, and implementing the scheme"; he executed some of the trades himself, and participated in research and decisions to trade many of the OCL paths; and he tried to create false after-the-fact explanations.  Order at P 254.[3]

96.     Robert Jones "also played an important role in the OCL trading scheme by proposing and executing trades," and "[i]n close coordination with the other Respondents, he executed the second most OCL Trades—over 44 percent—of all Respondents."  Order at P 255.[4]

---

[2] Peter Jones's conduct is discussed throughout the Order.  *See, e.g.,* Order at PP 10-12, 29, 32, 52, 62-64, 76, 86, 106, 112 n.276, 114 n.280, 117 n.288, 151 n.291, 152, 157, 175, 176 n.477, 177, 201, 219, 225, 230, 233, 234, 239, 253, 255, 266-71, 273, 284-85, 296, 298, 301, 313-15, 319 n. 842, 321, 331-33, 335-37, 345, 360.

[3] Shawn Sheehan's conduct is discussed throughout the Order.  *See, e.g.,* Order at PP 10-12, 21 n.45, 29, 32, 39 n.83, 41, 49, 54, 62-64, 76, 81, 82 n.194, 86, 107 n.258, 110 n.266, 112-13, 116 n.285, 119, 125-26, 129, 149-50, 154 n.406, 158, 175, 218-19, 222, 224, 230 n.639, 234, 239, 254, 257 n.696, 264 n.712, 267-68, 270, 284, 296, 298, 301, 313-14, 331-35, 337, 343, 346, 349, 352, 355-56, 360.

[4] Robert Jones's conduct is also discussed throughout the Order.  *See, e.g.,* Order at PP 10-12, 29, 32, 41, 55 n.122, 86, 111 n.272, 117 n.288, 127 n.316, 151-53, 176 n.477

97.     Jack Wells "proposed and executed many of Respondents' UTC Trades," and "he executed more of the OCL Trades—over 46 percent—than any other Respondent."  Order at P 256.[5]

98.     Jeff Miller "was heavily involved in researching, strategizing about, designing, and implementing Coaltrain's OCL Strategy," and he "participated in decisions to execute OCL Trades."  Order at P 257.[6]  Miller conducted research about the credits and strategized about the OCL Strategy in communications that "show that he viewed the strategy as a way to profit solely, or in large part, from MLSA payments, as distinguished from Coaltrain's Spread Strategy."  *Id.*

## B.     Coaltrain's False and Misleading Statements

99.     In addition to finding that each of the Respondents violated section 222 of the FPA and the Anti-Manipulation Rule, the Commission also found that Coaltrain violated 18 C.F.R. § 35.41(b) by making false or misleading statements and material omissions regarding the existence of documents recorded and preserved by Coaltrain's "Spector 360" computer security monitoring software.  Order at P 259.

---

& 478, 178 n.490, 179, 201, 203, 218, 225, 229 n.636, 239, 253 n.683, 255-56, 257 n.697, 266, 335, 338-39, 347.

[5] The Commission discusses Jack Wells's conduct throughout the Order.  *See, e.g.,* Order at PP 10-11, 21 n.45, 29, 32, 38, 39 n.80, 45, 54, 60, 86, 107 n.254 & n.257, 118 n.285, 127 n.316, 129 n.321, 154, 160 n.430, 163 n.439, 167 n.446, 168 n.452, 176-77, 178 n.490, 201, 207 n.573, 210 n.586, 225, 229 n.636 & n.639, 239, 253 n.683, 256, 258 n.697, 266, 314 n.837, 335, 339, 348.

[6] Jeff Miller's conduct is discussed throughout the Order.  *See, e.g.,* Order at PP 10-11, 21 n.45, 29, 32, 37 n.75 & n.76, 39 n.80, 41, 45 n.99, 59 n.133, 81, 86, 107 n.254 & n.258, 110 n.266, 111 n.271, 112-13, 151 n.391, 152, 178 n.490, 207 n.573, 222, 225, 230 n.639, 239, 253 n.681, 254 n.686, 256 n.694, 257, 259 n.696, 313, 334, 335, 340, 343, 346, 349, 352.

100.    Section 35.41(b) of the Commission's regulations provides:

> A Seller must provide accurate and factual information and not
> submit false or misleading information, or omit material
> information, in any communication with the Commission,
> Commission-approved market monitors, Commission-approved
> regional transmission organizations, or jurisdictional transmission
> providers, unless Seller exercises due diligence to prevent such
> occurrences.

Order at P 258 (quoting 18 C.F.R. § 35.41(b)).  This provision imposes a "duty of

accuracy and candor" on regulated Sellers, and that it is "particularly important when it

involves an investigation by Commission staff into potential violations."  *Id.* P 274.

101.    The Commission found that Coaltrain qualified as a "Seller" because it had

market-based rate authority at the time of the communications, until April 15, 2011, and

therefore was subject to section 35.41(b).  Order at P 278.

102.    The Commission also found that Coaltrain possessed documents from

Spector 360, whose function was to record every keystroke and take a screenshot of

every monitor on every computer in which it was installed.  Coaltrain knew about but

failed to produce relevant documents recorded by Spector 360 to Enforcement in

response to the Second Data Request and subsequent data requests.  Order at P 62.

Coaltrain paid for this software and installed it on the work and home computers of

everyone at the company except for the co-owners (Peter Jones and Shawn Sheehan).  *Id.*

Coaltrain employees were very familiar with Spector 360; for instance Peter Jones and

Shawn Sheehan "used the detailed information obtained from the software to terminate

an employee in 2010."  *Id.* P 63.  Despite knowing that Coaltrain possessed the records,

Peter Jones did not produce the data and yet repeatedly attested in sworn statements that

Coaltrain's responses "were 'true, complete, and accurate.'" *Id.* (quoting Coaltrain Response to Enforcement's Amended Second Data Request (Feb. 3, 2011); Coaltrain Response to Enforcement's Third Data Request (May 25, 2012)).

103.    The Commission found that on November 19, 2010—after receiving the Second Data Request that requested documents and communications pertaining to Coaltrain's UTC trading and strategy—one of Coaltrain's analysts emailed Peter Jones and Shawn Sheehan "to let [them] know that [he] logged into Spector this morning to view the activity on the computer in the team room." *Id.* P 64 (quoting COALTRAIN0011640).  That same analyst, who was also partly responsible for responding to the Second Data Request, also communicated with Spector 360's support staff in January 2011 (shortly before the response to the Second Data Request).  *Id.*

104.    Even though Respondents actually knew about Spector 360 when Enforcement asked for documents relating to UTC trading and strategy, Coaltrain did not produce any documents recorded by Spector 360 until after Enforcement independently discovered the existence of the Spector 360 cache of documents from a former Coaltrain employee.  Order at PP 8, 238.

105.    After receiving the Fifth Data Request on July 3, 2012 that specifically called for production of the Spector 360 documents, "Coaltrain still tried to withhold the documents by falsely claiming that it could not access the Spector 360 data because it no longer has a license to it."  Order at P 65.  The Commission cited to an internal email from July 5, 2012 and found that Coaltrain's personnel, including Peter Jones, were able

to access the stored Spector 360 data even though they later falsely stated that they could not do so. *Id.* (citing COALTRAIN011649); *see also*, *id.* P 285.

106. Coaltrain's false and misleading statements and omissions were material because the "Spector 360 documents were clearly related to the core subjects at issue in OE Staff's investigation: Coaltrain's OCL Strategy and evidence of its contemporaneous intent." Order at P 279.

107. The Commission stated that a violation of section 35.41(b) need not be the result of an intentional act. Order at P 280. Instead, it is "'sufficient if the false or misleading information was provided, or omission of material information was made, without due diligence exercised by the Seller." *Id.* (quoting *City Power*, 152 FERC ¶ 61,102 at P 217). The Commission held that the duty of candor "goes beyond the 'literal truth' defense and the bare minimum need to avoid criminal perjury liability." *Id.* After considering the evidence in the record, the Commission nevertheless found that Coaltrain's "actions to withhold the data were intentional." Order at P 281. "Coaltrain's representations regarding the Spector 360 documents were intentionally misleading, thereby unnecessarily wasting Commission resources in addition to violating its duty of candor and accuracy." Order at P 286. "[I]t is not plausible that these statements and omissions were merely inadvertent oversights or document collection errors." *Id.*

### C.     Remedies and Sanctions

108. Next, the Commission assessed sanctions. At the time the Order was issued, section 316A of the FPA authorized the Commission to assess up to $1 million per violation per day. Order at P 288; FPA section 316A, 16 U.S.C. § 825*o*-1. In

determining the appropriate penalties, the FPA directs the Commission to consider two factors: "the seriousness of the violation" and "the efforts of such person to remedy the violation in a timely manner." Order at P 288.

109. **Coaltrain's Penalties.** The Commission found that Coaltrain's OCL Strategy "caused significant harm to other PJM market participants" by diverting MLSA and by "reducing the availability of transmission in PJM." Order at PP 303-09. The Commission also found that Coaltrain's false and misleading statements and material omissions caused harm "by thwarting OE Staff's efforts to investigate the relevant conduct;" and that its efforts to withhold the Spector 360 documents were intentional, deceitful, reckless, and indifferent to the result of such actions. Order at PP 317-21. The Commission therefore found that the proposed $26 million penalty "is particularly appropriate given Coaltrain's multiple types of violations." *Id.* P 328.

110. The Commission also found that Peter Jones and Shawn Sheehan, as the company's co-owners, should be jointly and severally liable for Coaltrain's penalties. Order at P 331. The FPA gives the Commission "broad authority to, among other things, 'perform any and all acts … as [we] may find necessary or appropriate to carry out the provisions of [the FPA].'" *Id.* (quoting FPA section 309, 16 U.S.C. § 825h). Here, the Commission held that it is appropriate to impose joint and several liability because Peter Jones and Shawn Sheehan owned and controlled Coaltrain, and they are able to effectively nullify the company's penalties by bankrupting it. *Id.* This includes the fact that Peter Jones and Shawn Sheehan withdrew more than $33 million from the company after this investigation began, leaving it with insufficient funds to pay its penalties.

43

111.    **Penalties for the Individual Respondents.**  The Commission examined the record evidence and found that the individual Respondents should be assessed penalties in the following amounts:

- **Peter Jones:**  $5 million in civil penalties for his primary role in developing and executing the OCL Strategy, and his lack of cooperation and efforts to withhold the Spector 360 documents.  Order at P 345.

- **Shawn Sheehan:**  $5 million in civil penalties for his primary role in implementing, designing, and executing the OCL Strategy.  Order at P 346.

- **Robert Jones:**  $1 million for his significant role in executing the scheme and for his role in advising on OCL Trades.  Order at P 347.

- **Jack Wells:**  $500,000 in civil penalties for his significant role in executing and advising on the OCL Strategy.  Order at P 348.

- **Jeff Miller:**  $500,000 in civil penalties for his significant role in designing and advising on the OCL Strategy.  Order at P 349.

112.    **Disgorgement.**  Finally, the Commission found that Coaltrain received $4,121,894 in unjust profits from the OCL Strategy, and that the company should disgorge this amount.  Order at PP 357-59.  The Commission also held Peter Jones and Shawn Sheehan jointly and severally liable for Coaltrain's disgorgement.  *Id.* P 360.

## FIRST CLAIM FOR RELIEF

**(Against Coaltrain, Peter Jones, Shawn Sheehan, Robert Jones, Jack Wells, and Jeff Miller for Violating FPA Section 222, 16 U.S.C. § 824v, and 18 C.F.R. § 1c.2)**

113.    The Commission repeats each and every allegation set forth in Paragraphs 1 through 112, as if set forth fully herein.

114.    Section 222(a) of the FPA makes it unlawful for any entity, directly or indirectly, to use or employ a deceptive or manipulative device or contrivance in

44

contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of electric ratepayers, in connection with the purchase of sale of electric energy or the transmission of electric energy subject to the Commission's jurisdiction.

115.    The Commission's Order No. 670 implemented this prohibition, incorporated the Commission's pre-existing anti-manipulation authority, and adopted the Anti-Manipulation Rule, 18 C.F.R. § 1c.2 (2015).  That rule, among other matters, prohibits any entity from:  (1)(a) using a fraudulent device, scheme or artifice, (b) making a material misrepresentation or a material omission as to which there is a duty to speak under a Commission-filed tariff, Commission order, rule or regulation, or (c) engaging in any act, practice, or course of business that operates or would operate as a fraud or deceit upon any entity; (2) with the requisite scienter; (3) in connection with the purchase, sale or transmission of electric energy subject to the Commission's jurisdiction.

116.    Each Respondent used or employed a fraudulent device, scheme, or artifice, or engaged in an act, practice, or course of business that operates or would operate as a fraud or deceit, with scienter, in connection with electric energy subject to the jurisdiction of the Commission, in contravention of FPA section 222, 16 U.S.C. § 824v, and 18 C.F.R. § 1c.2.  This involved a fraudulent scheme to place artificial UTC trades pursuant to the OCL Strategy that falsely appeared to be legitimate trades to deceive PJM into diverting MLSA payments from other market participants.

117.    In addition, Coaltrain made false, misleading, and deceptive statements in its joint submission to the Commission on June 9, 2010, in which it was stated that

45

financial traders do virtual trades solely based on price spreads, and omitting any mention of the OCL Strategy that they were devising at that time.  Respondents further demonstrated their fraudulent intent by continuing to execute the Other OCL Trades pursuant to the OCL Strategy after PJM and the IMM asked them to stop trading the most successful OCL paths, after PJM and the IMM publicly identified the UTC scheme as wrongful, and after PJM filed its request to amend the tariff.

## SECOND CLAIM FOR RELIEF

### (Against Coaltrain for Violating 18 C.F.R. § 35.41(b))

118.    The Commission repeats each and every allegation set forth in Paragraphs 1 through 112 and Paragraphs 113 through 117, as if set forth fully herein.

119.    Section 35.41(b) of the Commission's regulations requires that a Seller "provide accurate and factual information and not submit false or misleading information, or omit material information, in any communication with the Commission . . . unless Seller exercises due diligence to prevent such occurrences."

120.    Coaltrain was a Seller as that term as defined in 18 C.F.R. § 35.36(a)(1) because it had authorization to make market-based sales for resale of electric energy.

121.    Coaltrain made false and misleading statements and omitted material information in communications with Commission staff concerning the existence of relevant documents recorded and preserved by the company's Spector 360 software. Coaltrain did not exercise due diligence to prevent these false and misleading statements or to avoid these material omissions.  Although not necessary to establish a violation of section 35.41(b), Coaltrain's violations were knowing and intentional.

46

## JURY DEMAND

122. The Commission respectfully submits that this Court can and should affirm the penalty assessments without modification following a review of the Commission's Order and the materials presented to the Commission during the penalty proceeding.

123. Should the Court determine, however, that its review of the Order requires a trial on any issue, the Commission, pursuant to Rule 38 of the Federal Rules of Civil Procedure, demands a trial by jury on all issues triable as such.

## PRAYER FOR RELIEF

124. WHEREFORE, the Commission respectfully requests that this Court:

125. Enter an order and judgment affirming the Commission's assessment of a $26 million civil penalty against Coaltrain, and ordering Coaltrain, Peter Jones, and Shawn Sheehan (jointly and severally) to pay that penalty.

126. Enter an order and judgment affirming the Commission's assessment of a $5 million civil penalty against Peter Jones, and ordering him to pay that penalty.

127. Enter an order and judgment affirming the Commission's assessment of a $5 million civil penalty against Shawn Sheehan, and ordering him to pay that penalty.

128. Enter an order and judgment affirming the Commission's assessment of a $1 million civil penalty against Robert Jones, and ordering him to pay that penalty.

129. Enter an order and judgment affirming the Commission's assessment of a $500,000 civil penalty against Jack Wells, and ordering him to pay that penalty.

130. Enter an order and judgment affirming the Commission's assessment of a $500,000 civil penalty against Jeff Miller, and ordering him to pay that penalty.

47

131. Enter an order and judgment affirming the Commission's order requiring Coaltrain, Peter Jones, and Shawn Sheehan (jointly and severally) to disgorge $4,121,894 in unjust profits (plus interest) and ordering Coaltrain, Peter Jones, and Shawn Sheehan to pay that amount in the manner specified in the Order.

132. Order such other and further relief as may be necessary and appropriate.

Respectfully submitted,

FEDERAL ENERGY REGULATORY COMMISSION

LARRY PARKINSON
Director, Office of Enforcement

LEE ANN WATSON
Deputy Director, Office of Enforcement

COURTNEY SPIVEY URSCHEL
Acting Director, Division of Investigations

**s/ James C. Owens**

JAMES C. OWENS
SAMUEL G. BACKFIELD
CATHERINE COLLINS
Federal Energy Regulatory Commission
888 First Street, NE
Washington, DC 20426
(202) 502-6166
James.Owens@ferc.gov

*Counsel for Petitioner Federal Energy Regulatory Commission*

*Of Counsel*
BENJAMIN C. GLASSMAN
Acting United States Attorney
Southern District of Ohio

Dated: July 27, 2016

48