**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

Federal Energy Regulatory
Commission,

    Plaintiff,

    v.                          Case No. 2:16-cv-732

Coaltrain Energy, L.P., *et al.*,        Judge Michael H. Watson
                                   Magistrate Judge Jolson
    Defendants.

## OPINION AND ORDER

The Federal Energy Regulatory Commission ("FERC" or "Commission")
brings this action against Coaltrain Energy, L.P. ("Coaltrain"), Peter Jones ("P.
Jones"), Shawn Sheehan ("Sheehan"), Jeff Miller ("Miller"), Robert Jones ("R.
Jones"), and Jack Wells ("Wells") (collectively, "Defendants") pursuant to section
31(d)(3)(B) of the Federal Power Act, 16 U.S.C. § 823(d)(3)(B), seeking to
enforce FERC's May 27, 2016, order assessing civil penalties against
Defendants. Compl., ECF No. 1. Defendants move to dismiss FERC's
Complaint[1] for lack of personal jurisdiction, improper venue, and failure to state a
claim. ECF Nos. 23, 24, 25. For the following reasons, Coaltrain's motion is
**DENIED** and the remaining Defendants' motions are **GRANTED IN PART AND
DENIED IN PART**.

---

[1] The Court refers to what FERC styled as a "Petition" as the "Complaint."

## I.    BACKGROUND

The following facts are taken from FERC's Complaint.

FERC is an administrative agency charged with ensuring just and reasonable prices of wholesale electricity and regulating and policing the wholesale electricity markets.  The markets are regionally operated by FERC-regulated Regional Transmission Organizations ("RTOs").  RTOs are tasked with balancing the minute-by-minute supply and demand requirements for electric power across their regions.  PJM Interconnection, LLC ("PJM") is the largest RTO in the nation, covering 13 states, including Ohio.

Coaltrain was a licensed "Seller"[2] that traded electricity on the PJM market during the time period the wrongful conduct is alleged to have occurred—June 15 through September 2, 2010.  During that same time period, P. Jones and Sheehan were the co-owners of Coaltrain, and R. Jones, Miller, and Wells worked for Coaltrain as energy traders in the PJM market.

FERC authorizes certain types of electric (i.e., physical) and financial (i.e., virtual) trading in the electricity market.  With respect to at least the PJM market, electricity prices vary based on the specific location ("node") in the market. There are thousands of nodes within the PJM market, many of which are in this judicial district.  The market price for energy at a particular node is called the Locational Marginal Price ("LMP") and consists of (1) a basic energy price, (2)

---

[2] "Seller means any person that has authorization to or seeks authorization to engage in sales for resale of electric energy, capacity or ancillary services at market-based rates under section 205 of the Federal Power Act."  18 C.F.R. § 35.36(a)(1).

the cost of congestion at each node, and (3) the cost of line losses (the amount of electricity lost as heat during transmission).

PJM operates a day-ahead market and a real-time market. Electricity traded on the day-ahead market is transmitted over power lines the following day, while electricity traded on the real-time market is transmitted over power lines that same day.

In addition to transactions involving the delivery of electricity, PJM also offers virtual products. These are financial trades for which no generation of electricity is dispatched and no load is served. Virtual transactions carry no obligation to buy or sell electricity, but they affect day-ahead market prices as reflected by the LMPs. Virtual trades also benefit the wholesale electricity markets because they promote market efficiency, increase market liquidity, and create price convergence between the day-ahead and real-time markets. In other words, they help balance out the price of electricity and achieve more just and reasonable rates.

Certain financial instruments, called Up-To Congestions ("UTC"), allow traders to profit through price arbitrage—by correctly predicting that the difference in the price of electricity at two different nodes (known as the "price spread") will either widen or narrow from one day to the next. UTC trades, like physical trades made on the day-ahead market, require a Seller to reserve transmission on the day-ahead market. Financial trades thus prevent other

market participants from using the reserved transmission unless PJM re-releases it into the day-ahead market later in the trading day.

During the summer of 2010, transmission reservations could be either paid or unpaid. Traders could permissibly avoid paying for reservations in a variety of ways, including by exporting from PJM into the wholesale market region operated by the neighboring RTO. Alternatively, traders could pay a specified price per megawatt hour ("MWh") to reserve transmission between two nodes in the PJM market.

During the pertinent timeframe, all physical and all UTC trades that used paid transmission were eligible to receive a pro rata portion of Marginal Loss Surplus Allocation ("MLSA") payments that PJM distributes to market participants. MLSA comes from the surplus of money collected by PJM to account for transmission line losses. Transmission line losses represent the amount of electricity lost in the form of heat during its transmission. PJM charges line losses as one component of the LMP, which it uses to compensate generators for lost electricity. To send the appropriate price signals, PJM sets the price for line losses at the marginal, rather than average, rate. Doing so, however, causes PJM to collect more in line losses than it distributes to generators. The resulting surplus is distributed to market participants in the form of MLSA credits.

For a time, PJM distributed MLSA credits only for physical trades. Beginning in June 2010, however, PJM also began distributing MLSA for

financial trades that used paid transmission; financial trades using free transmission remained ineligible for MLSA credits.  Under this method of distribution, PJM determined for each hour of the day the amount of MWh of eligible trades and allocated the surplus collected that hour on a per-MWh pro rata basis to all market participants who made those eligible trades.  A market participant was eligible to receive MLSA credits based on the volume of its trades regardless of whether they actually proved profitable.  Accordingly, as a market participant's volume of paid virtual trades increased, so did its share of MLSA credits.

In late July through August of 2010, PJM discovered that Defendants were using UTC trades not to profit through price arbitrage but instead to profit solely from MLSA credits earned on the trades.  FERC investigations commenced shortly thereafter.  Those investigations uncovered the wrongful conduct that FERC alleges here: that, since June 2010, Defendants had engaged in a large volume of UTC trades using paid transmission, despite knowing those trades would be profitless, because the amount of MLSA collected on those trades outweighed the cost of transmission reservations.  FERC discovered that these trades were made pursuant to a strategy that Coaltrain internally referred to as its "OCL Strategy."[3]  Between June and September 2010, Defendants labeled all of their UTC trades as either "OCL Strategy" trades—trades that were designed to

---

[3] "OCL" stood for "Over-Collected Losses."

profit solely or primarily from MLSA credits—and "Spread Strategy" trades—trades that were designed to profit from price arbitrage.

After an investigation, FERC determined that Defendants' OCL Strategy trades harmed the market by (1) diverting credits that should have been credited toward other market participants and (2) tying up transmission that other market participants could have used for legitimate trading.

Further, throughout the investigation, FERC's Office of Enforcement ("Enforcement") made several data requests to Defendants. In its second data request, in November 2010, Enforcement requested that Coaltrain produce copies of all documents and communications relating to the company's UTC trading and strategy. Coaltrain produced documents, which P. Jones attested were "true, complete, and accurate." In June 2012, however, a former Coaltrain employee informed Enforcement that the company had used a software called "Spector 360," which recorded every single keystroke made on an employee's work and home computer and captured a screenshot image of the monitors on those computers every twenty seconds. FERC asked Coaltrian about this software. Initially, Defendants denied that they could access Spector 360 records. Eventually, however, Enforcement learned that Defendants in fact had been able to access them. Once Defendants finally produced the Spector 360 records, they proved essential to FERC's investigations.

Based on Enforcement's investigation, FERC issued a show cause order to Defendants in early 2016. On May 27, 2016, FERC issued an order finding

that Defendants used financial instruments to manipulate and defraud the nation's largest wholesale energy market and that Coaltrain made false and misleading statements and material omissions during the investigation in an effort to cover up that scheme.

FERC concluded that Defendants violated 16 U.S.C. § 824v(a) and 16 C.F.R. § 1c.2(a) (the "Anti-Manipulation Rule"), which together prohibit manipulation of the electricity wholesale market, and violated 18 C.F.R. § 35.41(b), FERC's "Rule of Candor," which prohibits Sellers from making false or misleading statements in any communication with FERC.

FERC assessed $38 million in civil penalties and $4.12 million in disgorgement.  Defendants have not paid the penalties and disgorgement, and FERC now seeks an Order from this Court affirming and enforcing its May 27, 2016, Order.

This Court has subject matter jurisdiction over the case pursuant to 16 U.S.C. § 823b(d)(3).

## II.    APPLICABLE PROCEDURE

The parties debate how the Court should handle this case procedurally. Defendants contend that this case should proceed like any other civil lawsuit and that the Federal Rules of Civil Procedure should apply.  FERC contends that this is more akin to an administrative review proceeding.  Apparently, neither the United States Supreme Court nor any United States Court of Appeals has determined this issue, but all district courts to have considered the issue have

determined that cases such as this one should proceed like any other civil lawsuit. *Fed. Energy Regulatory Comm'n v. Powhatan Energy Fund, LLC*, No. 3:15cv452, 2017 WL 6629093, at *4 (E.D. VA Dec. 28, 2017); *id.* n.14 (citing *Fed. Energy Regulatory Comm'n v. Silkman*, 233 F. Supp. 3d 201 (D. Maine 2017); *Fed. Energy Regulatory Comm'n v. Barclays Bank PLC*, 247 F. Supp. 3d 1118 (E.D. Cal. 2017); *Fed. Energy Regulatory Comm'n v. Etracom LLC*, No. 2:16-cv-01945-SB, 2017 U.S. Dist. LEXIS 33430 (E.D. Cal. Mar. 8, 2017); *Fed. Energy Regulatory Comm'n v. City Power Marketing, LLC,* 199 F. Supp. 3d 218, 232 (D.D.C 2016), *Fed. Energy Regulatory Comm'n v. Maxim Power Corp.*, 196 F. Supp. 3d 181, 191 (D. Mass. 2016)). For the reasons addressed in those decisions and without repeating the same, this Court agrees.

### III. STANDARD OF REVIEW

A claim survives a motion to dismiss pursuant to Rule 12(b)(6) if it "contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*. This standard "calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of [unlawful conduct]." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). A complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the

complaint are true (even if doubtful in fact)." *Id.* at 555 (internal citations omitted).

A court must also "construe the complaint in the light most favorable to the plaintiff." *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002). In doing so, however, plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555; *see also Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."); *Ass'n of Cleveland Fire Fighters v. City of Cleveland*, 502 F.3d 545, 548 (6th Cir. 2007). "[A] naked assertion . . . gets the complaint close to stating a claim, but without some further factual enhancement it stops short of the line between possibility and plausibility . . . ." *Twombly*, 550 U.S. at 557. Thus, "something beyond the mere possibility of [relief] must be alleged . . . ." *Id.* at 557–58 (internal citations omitted).

When ruling on a motion to dismiss, the Court considers the allegations contained in the Complaint and any exhibits attached to it. *Rondigo, L.L.C. v. Twp. of Richmond*, 641 F.3d 673, 680–81 (6th Cir. 2011). The findings contained in FERC's Penalty Order, which was attached to and incorporated in the Complaint, are therefore accepted as true for the purpose of Defendants' motions to dismiss.

Moreover, as with any Complaint alleging fraud, FERC's Complaint must also comply with Rule 9(b)'s requirement that fraud be pled with particularity. *In*

*re SmarTalk Teleservices, Inc. Secs. Litig.*, 124 F. Supp. 2d 527, 536 (S.D. Ohio 2000); *see also Chesbrough v. VPA, P.C.*, 655 F.3d 461, 466 (6th Cir. 2011). Rule 9(b) requires that, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). The Sixth Circuit interprets the particularity requirement liberally but requires plaintiffs to "allege the time, place, and content of the alleged misrepresentation(s)" constituting "the fraudulent scheme." *Bennett v. MIS Corp.*, 607 F.3d 1076, 1100 (6th Cir. 2010) (internal quotation marks omitted). And "[a]lthough Rule 9(b) permits the pleading of a condition of mind generally, allegations of fraudulent misrepresentation must be made with a sufficient factual basis to support an inference that they were knowingly, or recklessly[,] made." *In re SmarTalk Teleservices*, 124 F. Supp. 2d at 536.

## IV.   ANALYSIS

### A. Personal Jurisdiction

The Court's analysis begins with the threshold issue of personal jurisdiction.[4]  FERC "need only make a prima facie showing of [personal]

---

[4] FERC asserts in a footnote that it is choosing to respond to Defendants' defenses to personal jurisdiction notwithstanding the fact that "[Defendants] waived their objection to personal jurisdiction" by entering a general appearance. Resp. 18 n.11, ECF No. 31 (citing *Gerber v. Riordan*, 649 F.3d 514, 517 (6th Cir. 2011)). In that footnote, FERC avers that *Gerber* stands for the proposition that a party waives its defense to personal jurisdiction whenever its attorney enters a general appearance with the district court. Resp. 18 n.11, ECF No. 31. The Court disagrees.

In *Gerber*, the majority did indeed find counsel's entry of appearance dispositive. 649 F.3d at 520. But the general rule set forth in *Gerber* indicates that entry of appearance may not constitute waiver in every case. According to that rule, a defense to personal jurisdiction is waived when a party makes "submissions, appearances [or]

jurisdiction," and the court considers the allegations in FERC's complaint in the light most favorable to it. *CompuServe, Inc. v. Patterson*, 89 F.3d 1257, 1262 (6th Cir. 1996).

In its Complaint, FERC alleges that personal jurisdiction is proper under Federal Rule of Civil Procedure 4(d)(1)(C), which states that "[s]erving a summons or filing a waiver of service establishes personal jurisdiction over a defendant . . . when authorized by a federal statute." The FPA, in turn, provides for nationwide service of process. 16 U.S.C. § 825p. The Sixth Circuit has held that when a statute allows for nationwide service of process, it confers personal jurisdiction in any federal district court over any defendant with minimum contacts to the United States. *United Liberty Life Ins. Co. v. Ryan*, 985 F.2d 1320, 1330 (6th Cir. 1993) (interpreting the nationwide service-of-process provision in Section 27 of the Exchange Act) (citing *Haile v. Henderson Nat'l Bank*, 657 F.2d

---

filings that give '[P]laintiff a reasonable expectation that [it] will defend the suit on the merits or [that] cause the court to go to some effort that would be wasted if personal jurisdiction is later found lacking . . . .'" *Id.* at 519 (internal citation omitted); *see also Cty. Sec. Agency v. Ohio Dep't of Commerce*, 296 F.3d 477, 483 (6th Cir. 2002) ("In order to object to a court's exercise of personal jurisdiction, it is no longer necessary to enter a 'special appearance.'"). Some courts applying *Gerber* have considered the totality of a party's behavior in addition to the party's "submissions, appearances, and filings" to determine whether the party waived a defense to personal jurisdiction. *See, e.g.*, *Miami Valley Fair Hous. Ctr., Inc. v. Steiner & Assocs., Inc.*, No. 3:08-cv-150, 2012 WL 5830252, at *3 (S.D. Ohio Nov. 16, 2012) (finding that defense counsel's entry of general appearance did not constitute a waiver of the defense to personal jurisdiction because counsel's behavior prior to the entry clearly informed plaintiffs that the defendants would object to personal jurisdiction and the plaintiffs therefore had no "reasonable expectation that the defendants would defend the suit on the merits"). Thus, the issue of waiver is not as clear-cut as FERC intimates. In any event, the Court need not delve into a thorough analysis of waiver here—because FERC asserts this argument in a footnote with scant analysis, the Court considers FERC's waiver argument waived. *See Calvert v. Wilson*, 288 F.3d 823, 837 (6th Cir. 2002).

816 (6th Cir. 1981)).  Defendants do not dispute that they have minimum contacts with the United States.  Rather, they aver that, notwithstanding the Sixth Circuit's seemingly all-encompassing rule stated in *United Liberty*, the text of 16 U.S.C. § 825p limits the availability of nationwide service of process—and thus, personal jurisdiction—to only those cases in which the FPA's venue requirements are also met.

Defendants' personal jurisdiction arguments begin and end with the text of 16 U.S.C. § 825p.  That statute states that actions arising under the FPA may be brought "in the district wherein any act or transaction constituting the violation occurred . . . or in the district wherein the defendant is an inhabitant, and process *in such cases* may be served wherever the defendant may be found."  16 U.S.C. § 825p (emphasis added).  Defendants argue that the phrase "in such cases" limits the availability of nationwide service of process to cases in which the venue requirements immediately preceding that phrase are met.  That is, nationwide service of process, Defendants contend, is only proper when venue is proper.

Defendants argue that the broad rule stated in *United Liberty*—that nationwide service of process allows for personal jurisdiction in any federal district as long as the defendant has minimum contacts with the United States— does not control here, because the *United Liberty* court did not specifically address whether nationwide service of process was predicated upon proper venue.  Moreover, Defendants assert that there is a circuit split over whether the venue clause in similar statutory provisions should be read as separate from, or

as a predicate to, the nationwide service-of-process clause. *Compare, e.g.,*

*Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 427 (2d Cir. 2005) ("[W]hen

we interpret Section 12 [of the Clayton Act] 'the way it is written,' we are obliged

to conclude that its service of process provision can properly confer personal

jurisdiction over a defendant only . . . [in] the district where Section 12 venue

lies.") (internal quotation marks omitted) (citing *GTE New Media Servs. Inc., v.*

*BellSouth Corp.*, 199 F.3d 1343, 1351 (D.C. Cir. 2000)), *with, e.g., Action*

*Embroidery Corp. v. Atl. Embroidery, Inc.*, 368 F.3d 1174, 1179–80 (9th Cir.

2004) (finding that the Clayton Act's Section 12 venue and service of process

clauses are independent and that "the existence of personal jurisdiction over a[]

. . . defendant does not depend upon there being proper venue in that court").

Defendants urge this Court to follow the approach adopted by the D.C. and

Second Circuits, which predicate personal jurisdiction on proper venue.

While the Sixth Circuit has not applied the rule stated in *United Liberty*

specifically to the FPA, Defendants fail to distinguish in any material respect the

Exchange Act interpreted there and the FPA at issue here.  In fact, the relevant

provisions in each statute contain virtually identical language.  *Compare* Section

12 of the Exchange Act, 15 U.S.C. § 78aa(a) (stating that suit may be brought "in

the district wherein any act or transaction constituting the violation occurred . . .

or in the district wherein the defendant is found or is an inhabitant or transacts

business, *and process in such cases* may be served in any other district of which

the defendant is an inhabitant or wherever the defendant may be found"

(emphasis added)), *with* Section 317 of the FPA, 16 U.S.C. § 825p (stating that suit may be brought "in the district wherein any act or transaction constituting the violation occurred . . . or in the district wherein the defendant is an inhabitant, *and process in such cases* may be served wherever the defendant may be found" (emphasis added)).  Notably, the defendants in *United Liberty* made the exact same argument that Defendants make in this one: "that jurisdiction under [the Act] is predicated upon proper venue . . . ."  *United Liberty*, 985 F.2d at 1330.  The court in *United Liberty* held, without qualification, that the Exchange Act's nationwide service-of-process provision allowed for personal jurisdiction in any federal court.  *See id.* at 1330–31(finding that as long as the plaintiff had adequately pleaded a claim for relief under the Exchange Act then the district court would have personal jurisdiction over the defendants even if the court was not the proper venue).  There is no reason to believe the Sixth Circuit would reach a different outcome in this case.

In any event, this Court need not definitively determine whether personal jurisdiction in FPA cases should be limited to those cases in which the venue requirements are met because it finds that venue is proper here.

## B. Venue

The FPA allows for civil suits to be brought "in the district wherein any act or transaction constituting the violation occurred . . . or in the district wherein the defendant is an inhabitant." 18 U.S.C. § 825p.  The parties agree that no

Defendant is an inhabitant of this district.  Therefore, the pertinent question is whether any act or transaction constituting the alleged violations occurred here.

FERC sets forth the following allegations in support of venue in this District:

1. Defendants' manipulative trading scheme defrauded PJM, whose coverage area includes the Southern District of Ohio;

2. the majority of Defendants' manipulative trades that had the potential to affect the wholesale price of electricity were placed at specific locations within this District;

3. to effectuate their manipulative trading scheme, a large volume of Defendants' transmission reservations were placed on paths that started or ended at places within this District;

4. many of the rest of Defendants' transmission reservations were placed on paths that entered, exited, or crossed through this District; and

5. the manipulative trading scheme deceived PJM into paying money to Defendants that otherwise would have gone to other market participants, and as a result entities operating or headquartered in this District—including American Electric Power ("AEP"), American Municipal Power, and Dayton Power & Light— lost approximately $1.4 million, and Ohio consumers were harmed because they would have received some of this money under state law regulations.

Compl. ¶ 15.

According to Defendants, venue is improper in this District because none of their transactions resulted in the physical flow of electricity through this District. Instead, Defendants assert that the transactions themselves were "purely virtual" and therefore only "occurred" in the locations where they originated—at trading desks located in Delaware or Pennsylvania.  The purely virtual nature of the

transactions, Defendants argue, distinguishes their transactions from those in *FERC v. Barclays Bank PLC*, 105 F. Supp. 3d 1121 (E.D. Cal. 2015). There, the court found venue was proper in the Eastern District of California, despite the fact that transfers of electricity were executed at trading desks in New York, in part because the defendants' transactions contemplated the physical transfer of energy through that district. *Id.* at 1134. Defendants argue that in this case, however, because the transactions did not cause any electricity to *physically flow through* this District, no act or transaction "occurred" here, and venue is therefore improper here. Instead, Defendants contend, the transactions occurred, and therefore venue is proper, only in Delaware or Pennsylvania.

Defendants' argument is essentially this: trades involving a virtual product (i.e., the UTC trades here), as opposed to a physical one (i.e. the electricity trades in *Barclays*), occur only at the location where the computer from which the trades are executed sits. But Defendants point to no authority, let alone binding authority, establishing such a rule. Defendants make too much of the fact that the transactions at issue in *Barclays* involved purchasing and selling electricity. Indeed, a careful reading of *Barclays* reveals that the defendants there never ultimately caused the physical movement of electricity into or out of the district— instead, the defendants simply "purchas[ed] and [sold] equal and offsetting amounts of electricity to other market participants, *in order to avoid any obligation to physically deliver or receive electricity*." *Id.* at 1134 (emphasis added). In other words, in *Barclays*, just as in this case, the alleged unlawful transactions

occurring within the district were, in effect, "purely financial transactions" involving no movement of electricity. *Id.* Defendants direct the Court to no case in which a court determined that venue is improper in a district in which only virtual trades were made.

In any event, any conceivable distinction between physical and virtual transactions makes no difference in this case, because both types of transactions require the reservation of transmission at specific locations on physical power lines. Resp. 25, ECF No. 31. Here, FERC alleges that Defendants, *inter alia*, made financial trades at specific nodes within this district, and, to execute those trades, reserved transmission on physical power lines located within this district. Compl. ¶ 15. As long as Defendants held those reservations, they excluded other market participants from using the same transmissions. Resp. 25, ECF No. 31. These transmission reservations and financial trades, which constituted Defendants' alleged unlawful scheme, actually took place in this District. Therefore, venue is proper here.

Accordingly, even if Defendants are correct that 16 U.S.C. § 825p predicates personal jurisdiction on proper venue, because venue is proper here, so is this Court's exercise of jurisdiction over Defendants.[5] Defendants' motion to dismiss for lack of jurisdiction is therefore **DENIED**.

---

[5] Establishing personal jurisdiction under 16 U.S.C. § 825p depends on one additional contested issue here: whether FERC has adequately stated a claim for a violation of the FPA. *Prakash v. Altadis U.S.A. Inc.*, No. 5:10CV0033, 2012 WL 1109918, at *21 (N.D. Ohio Mar. 30, 2012) ("Whether a plaintiff can rely on the nationwide service

## C. Transfer of Venue

Defendants contend that even if venue is proper here, the case should be transferred to the District of Delaware. Under 28 U.S.C. § 1404(a), "[f]or the convenience of the parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it may have been brought . . . ." A party seeking a transfer of venue "has the burden of establishing the need for a transfer of venue." *Jamhour v. Scottsdale Ins. Co.*, 211 F. Supp. 2d 941, 945 (S.D. Ohio 2002). Defendants must do more than demonstrate that the District of Delaware is a somewhat better forum; "unless the balance is strongly in favor of the defendant[s], the plaintiff's choice of forum should rarely be disturbed." *Reese v. CNH Am. LLC*, 574 F.3d 315, 320 (6th Cir. 2009).

In evaluating whether a transfer is appropriate, this Court will consider "the private interests of the parties, including their convenience and the convenience of potential witnesses, as well as other public-interest concerns, such as systemic integrity and fairness, which come under the rubric of 'interests of justice.'" *Moore v. Rohm & Haas Co.*, 446 F.3d 643, 647 n.1 (6th Cir. 2006) (citation omitted). "Relevant factors to consider include: the practical problem of

---

provisions of a federal statute '[d]epends upon whether [he] has adequately stated a claim' for a violation of that statute." (quoting *United Liberty Life Ins. Co. v. Ryan*, 985 F.2d 1320, 1330 (6th Cir. 1993) (alterations in original))). For the reasons stated below, the Court finds that FERC adequately states a claim for relief, and, therefore, FERC may avail itself of the FPA's personal jurisdiction provision.

trying the case most expeditiously and inexpensively; the interests of justice; the plaintiff's choice of forum; the defendant's preference; whether the claim arose elsewhere; the enforceability of the judgment; and the local interest in deciding local controversies at home." *Shumate v. Genesto, Inc.*, No. 2:17-cv-157, 2017 WL 4418577, \*1 (S.D. Ohio Oct. 4, 2017) (citing *Reese*, 574 F.3d at 320).

Defendants urge this Court to transfer the case to the District of Delaware based on convenience to witnesses and other public interest factors. Specifically, they assert that a majority of the individual Defendants who are likely to be called as witnesses reside in Delaware, FERC does not identify any likely witness who resides in Ohio, Delaware has a closer relation to the cause of action because most of the transactions at issue occurred there, and the docket is much less congested in the District of Delaware.

None of these factors move the balance heavily in favor of transfer. In fact, the factors identified by Defendants are either neutral or slightly in favor of FERC. As to convenience to witnesses, FERC asserts that it would likely present as third-party witnesses one or more Ohio-based utility companies to testify about how its customers were harmed by Defendants' purported scheme. Defendants do not identify a single third-party witness they would be likely to call, instead contending that the witnesses inconvenienced by this case proceeding in Ohio are Defendants themselves. "The convenience of non-party witnesses, however, 'is more important than the convenience of party witnesses on either side.'" *Cole v. JPMorgan Chase Bank, N.A.*, No. 2:15-cv-2634, 2016 WL

4491734, at *11 (Aug. 25, 2016 S.D. Ohio) (citation omitted).  Because FERC's likely third-party witnesses reside in Ohio, the convenience-to-witnesses factor weighs in favor of FERC.

Additionally, Defendants do not convincingly demonstrate that Delaware has a stronger interest in this action than Ohio does.  FERC alleges that many of the transactions made in furtherance of Defendants' scheme occurred in Ohio, among other states, and that the harm ultimately resulting from the scheme (higher electricity prices) fell on Ohio, not Delaware, consumers.

Finally, Defendants' statistical evidence comparing the case load in this District to the District of Delaware does not support transfer, either.  Defendants aver that data contained in the *Federal Courts Management Statistics* report[6] shows that district judges in Delaware had significantly fewer cases on their dockets in recent years than district judges did in this District.  But FERC points out that, according to the same data, the average time it took to dispose of cases during the same time frame was shorter in this District as compared to Delaware. Ultimately, then, the data fails to support Defendants' assertion that the District of Delaware is more capable of efficiently resolving this case.  None of Defendants' arguments persuade this Court that it should override FERC's choice of forum and transfer this action to the District of Delaware.  Accordingly, Defendants' motion to transfer venue is **DENIED**.

---

[6] Available at http://www.uscourts.gov/statistics-reports/federal-court-management-statistics-june-2016.

### D. Count One: Violations of 16 U.S.C. § 824v and 18 C.F.R. § 1c.2 (the Anti-Manipulation Rule)

In Count One of its Complaint, FERC alleges that all Defendants violated both Section 222 of the FPA (16 U.S.C. § 824v) and the Anti-Manipulation Rule (18 C.F.R. § 1c.2) by executing a fraudulent scheme to place artificial UTC trades pursuant to the OCL Strategy that appeared to be legitimate trades. FERC avers that this strategy deceived PJM into diverting MLSA payments from other market participants and tied up transmission that could have been used for legitimate trades.

#### 1. FERC has authority to regulate UTC transactions

Before the Court evaluates the sufficiency of FERC's claims, it addresses yet another threshold issue: whether FERC has authority to regulate UTC transactions. Defendants contend, in short, that FERC lacks jurisdiction to regulate UTC transactions because those transactions are purely virtual. The Court disagrees.

Section 22 of the FPA grants FERC authority to prohibit the use of a fraudulent scheme "in connection with the purchase or sale of electric energy or the purchase or sale of transmission services subject to the jurisdiction of the Commission." 16 U.S.C. § 824v(a). This Court adopts the explanation of the D.C. District Court in concluding that FERC's authority to regulate conduct "in connection with" the purchase or sale of transmission services encompasses virtual transactions:

> FERC's jurisdiction over "the transmission of electric energy in interstate commerce," [16 U.S.C.] § 824(b)(1), covers all transmission on an interconnected, multi-state grid like PJM's, *see New York v. FERC*, 535 U.S. 1, 16, 122 S. Ct. 1012, 152 L.Ed.2d 47 (2002) ("[T]ransmissions on the interconnected national grids constitute transmissions in interstate commerce."). Thus, when a market participant pays to reserve a share of the transmission available on PJM's network[,] that is a purchase of "transmission services subject to the jurisdiction of the Commission." The fact that a virtual trader might not ultimately use that reservation to flow physical power is irrelevant. All traders, virtual and real, use the same system for reserving transmission and compete for the same finite amount of transmission capacity. The entire process of transmission allocation in PJM is therefore subject to FERC's jurisdiction.

*City Power*, 199 F. Supp. at 239. Defendants' UTC transactions, though "purely financial," relied on paid transmission reservations. Defendants' conduct thus falls within FERC's regulatory ambit over fraudulent schemes employed "in connection with the purchase or sale of . . . transmission services . . . ." 16 U.S.C. § 824v(a).

## 2. The anti-manipulation provision of the FPA applies to natural persons

Sheehan and Miller argue that the Anti-Manipulation provision of the FPA does not apply to natural persons, and they therefore could not have violated that provision.

Section 222 of the FPA states:

> It shall be unlawful for any entity (including an entity described in section 824(f) of this title), directly or indirectly, to use or employ, in connection with the purchase or sale of electric energy or the purchase or sale of transmission services subject to the jurisdiction of the Commission, any manipulative or deceptive device or contrivance . . . in contravention of such rules and regulations as the

Commission may prescribe as necessary or appropriate in the public interest or for the protection of electric ratepayers.

16 U.S.C. § 824v(a). Sheehan and Miller contend that this provision of the statute unambiguously excludes natural persons because it contains the word "entity" rather than "person."

Sheehan and Miller first compare this provision of the FPA to Section 10(b) of the Securities and Exchange Act of 1934 ("SEA"), which provides that "it shall be unlawful for any person" to use or employ a manipulative or deceptive device or contrivance. See 15 U.S.C. § 78j. Defendants do not actually develop an argument surrounding this comparison, however. They merely point out that the SEA uses the term "person" and that the FPA was modeled after the SEA but uses the term "entity." The Court construes their brief as implying that because the SEA uses the term "person" and the FPA uses the term "entity," Congress must have intended the terms to have different meanings.

The Court disagrees. First, although the FPA itself does not define the term "entity," certain provisions indicate that the term as it is used in the statute is intended to apply to natural persons. For example, FPA § 824v(a) states that it includes those "entities" described in § 824(f). 16 U.S.C. § 824v(a) (stating that it applies to "any entity (including an entity described in section 824(f) of this title)"). Section 824(f), in turn, sets forth a list of agencies and corporations, along with their subdivisions, agents, and employees, which are generally exempt from regulation by the FPA. Thus, § 824v(a), by explicitly stating that it applies to

entities listed in § 824(f), brings within its ambit certain natural persons who are generally exempt from regulation under the statute. It makes little sense that the term "entity" in § 824v(a) would include certain natural persons listed in § 824(f) who are generally *exempted* from FERC's regulation, but not the officers, agents, or employees of bodies that *are* subject to FERC's regulation.

Second, although the SEA prohibits manipulation by any "person," 15 U.S.C. § 78j, the SEA defines the term "person" to include natural persons, companies, governments, or political subdivisions, agencies, or instrumentalities of a government. 15 U.S.C. § 78c(a)(9). Thus, "person" in the SEA is defined broadly enough to encompass natural persons and other "entities," and manipulation is prohibited by either natural persons or those other entities. It would make sense for the FPA, modeled after the SEA, to also use a term that includes natural persons and other entities in § 824v(a) if attempting to mirror 15 U.S.C. § 78j. But because the term "person" in the FPA means only individuals or corporations, and because § 824v is clearly meant to apply to others in addition to the bodies and natural persons described in § 824(f), the term "entity" more appropriately captures the various natural persons and bodies which are prohibited from engaging in market manipulation. The distinction between the use of "person" in the SEA and the use of "entity" in the FPA does not necessarily indicate congressional intent to give the sections different meanings.

Third, while the FPA does not define the term "entity," it uses that term in multiple sections, some of which refer to natural persons. *See* 16 U.S.C. § 824*o*-

1(b)(3)–(4), 824u, 824k(h). An interpretation of "entity" to include natural persons in Section 222 is thus consistent with the use of that term in other portions of the FPA.

Fourth, FERC itself has interpreted the term "to include any person or form of organization, regardless of its legal status, function or activities." 114 FERC ¶ 61,047, at *6 (2006). The Court finds this interpretation deserves *Chevron* deference. *Cf. City Power*, 199 F. Supp. 3d at 240–41; *Maxim Power Corp.*, 196 F. Supp. 3d at 201; *Silkman*, 177 F. Supp. 3d at 710–11.

Finally, all of the courts that have addressed the issue have concluded that the term "entity," as used in Section 222(a), applies to natural persons. *See City Power*, 199 F. Supp. 3d at 241 ("[T]he Court . . . agrees with the three other courts to have addressed this question that the term 'entity' in Section 222 can include individuals."); *Maxim Power Corp.*, 196 F. Supp. 3d at 201 ("The structure and purpose of the FPA's statutory scheme lead to the conclusion that Section 222(a) covers natural persons."); *Silkman*, 177 F. Supp. at 710 ("Read together with the structural features of the FPA identified by the *Barclays* court, the term 'entity' in this statutory context appears best read to include individuals."); *Barclays Bank PLC*, 105 F. Supp. 3d at 1146 ("Overall, a meaning of 'entity' that includes natural persons appears more consistent with the goals of FPA § 222 and the surrounding statutory scheme." (citation omitted)).

For all of these reasons, the Court rejects Sheehan's and Miller's argument and finds that the FPA's Anti-Manipulation provision applies to individuals.

### 3. FERC's allegations state a claim for relief

Defendants next argue that FERC fails to state a claim because their scheme does not involve any "manipulative or deceptive device or contrivance," as required by FPA Section 222. *See* 16 U.S.C. §824v(a).

Enacted in 2005, Section 222 of the FPA, 16 U.S.C. § 824v, prohibits, in relevant part, a market participant from using "any manipulative or deceptive device or contrivance (as those terms are used in [Section 10(b) of the Securities Exchange Act ("SEA")]) . . . ." 16 U.S.C. § 824v(a). As part and parcel of this anti-manipulation authority, FERC promulgated the Anti-Manipulation Rule. *Prohibition of Energy Market Manipulation*, Order No. 670, 114 FERC ¶ 61,047, 71 Fed. Reg. 4244-03 (2006) (codified at 18 C.F.R. § 1c.2). The Anti-Manipulation Rule explains that:

> It shall be unlawful for any entity, directly or indirectly, in connection with the purchase or sale of electric energy or the purchase or sale of transmission services subject to the jurisdiction of the Commission,
>
> > (1) To use or employ any device, scheme, or artifice to defraud,
> >
> > (2) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
> >
> > (3) To engage in any act, practice, or course of business that operates or would operate as a fraud or deceit upon any entity.

18 C.F.R. § 1c.2(a).  The Rule adopts a broad definition of "fraud" to mean "any action, transaction, or conspiracy for the purpose of impairing, obstructing or defeating a well-functioning market."  *Prohibition of Energy Market Manipulation*, Order No. 670, 114 FERC ¶ 61,047, at ¶ 50, 71 Fed. Reg. 4244-03 (2006) (codified at 18 C.F.R. § 1c.2).  Ultimately, what constitutes fraud "is a question of fact that is to be determined by all the circumstances of a case."  *Id.*  It also requires that a market participant have acted with scienter to be liable for a violation of the Rule.  *Id.* at ¶ 52.  Recklessness satisfies the Rule's scienter element.  *Id.* at ¶ 53.

FERC avers that Defendants used or employed a fraudulent "device, scheme, or artifice," or "engage[d] in an[] act, practice, or course of business that operate[d] . . . as a fraud or deceit" on PJM by using artificial UTC trades to deceive PJM into diverting a substantial amount of MLSA credits to Defendants instead of other market participants who executed legitimate trades.  FERC further alleges that Defendants carried out their fraudulent scheme knowing that it was designed for the purpose of diverting MLSA credits to them (in other words, with scienter).  These trades, moreover, were conducted in connection with the purchase or sale of electric energy and transmission service subject to FERC's jurisdiction.

To determine if the Complaint states a cause of action for 'fraud' under the Anti-Manipulation Rule, the Court turns first to the language of FPA Section 222.  *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 472 (1977) (explaining that "the

starting point in every case involving construction of a statute is the language [of the statute] itself" and determining whether a complaint stated "a cause of action for 'fraud' under Rule 10b-5" by "turn[ing] first to the language of [SEA] § 10(b)" (internal quotation marks, alterations, and citation omitted)). Thus, while the Anti-Manipulation Rule's definition of "fraud," "[r]ead for all its worth, . . . might appear to jettison any requirement of misrepresentation or deception" that is essential "to the common understanding of fraud," *City Power*, 199 F. Supp. 3d at 234, it is limited by Section 222's restriction that FERC regulate conduct arising only from the use of a "manipulative or deceptive device or contrivance." *See id.*; *see also Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 212–14 (1976).

Section 222 prohibits the use or employment of a "manipulative or deceptive device or contrivance . . . as those terms are used in [Section 10(b) of the SEA.]." 16 U.S.C. § 824v(a). Therefore, constitutes a manipulative or deceptive device or contrivance is guided by precedent interpreting SEA Section 10(b). As case law interpreting Section 10(b) has made clear, "[d]espite the disjunctive phrasing 'manipulative *or* deceptive,' it is well-established that conduct cannot run afoul of Section 10(b) unless it involves deception." *City Power*, 199 F. Supp. 3d at 234 (citations omitted) (emphasis in original); *see also Schreiber v. Burlington Northern, Inc.*, 472 U.S. 1, 7–8 (1985). "The same, then, is true of FPA Section 222. . . . [I]f [Section 10(b)] requires deception, so too must the Anti-Manipulation Rule." *City Power*, 199 F. Supp. 3d at 234.

What conduct counts as "deceptive" in violation of Section 10(b) (and, accordingly, Section 222 of the FPA), however, is not to be narrowly construed. *Id.* at 234. The Supreme Court has directed courts to "interpret Section 10(b) and Rule 10b-5 flexibly and broadly, rather than technically or restrictively." *VanCook v. SEC*, 653 F.3d 130, 138 (2011) (quoting *SEC v. Zandford*, 535 U.S. 813, 819 (2002) (internal quotation marks and alterations omitted)). Indeed, Section 10(b) has been characterized as a "catchall" provision, *Ernst & Ernst*, 425 U.S. at 203, designed to "prohibit all fraudulent schemes . . . whether the artifices employed involve a garden type variety of fraud, or present a unique form of deception." *Superintendent of Ins. of NY v. Bankers Life and Casualty Co. et al.*, 404 U.S. 6, 11 n.7 (1971) (citation omitted) ("Novel or atypical methods should not provide immunity from the securities laws."). The broad and flexible coverage of Section 10(b)'s prohibition against the use of a manipulative or deceptive device or contrivance is thus incorporated into Section 222 by its reference to Section 10(b).

This means that Section 222 proscribes deception not only in the form of misleading statements but also in the form of misleading "[c]onduct itself . . . ." *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 158 (2008); *Santa Fe Indus.*, 430 U.S. at 472; *see also SEC v. Familant*, 910 F. Supp. 2d 83, 91–92 (D.D.C. 2012) ("[T]he Supreme Court has . . . warned against limiting the statutory term 'deceptive' to 'specific oral or written statement[s] . . . .'" (citation omitted)). "And the same conduct may or may not be deceptive depending on an

actor's purpose." *City Power*, 199 F. Supp. 3d at 235 ("[U]nder Section 10(b), securities traders are not free to trade for whatever purpose they wish. Traders are presumed to be trading on the basis of their best estimates of a security's underlying economic value, *see, e.g.*, *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd*, 493 F.3d 87, 100–01 (2d Cir. 2007), and to trade for other purposes can be deceptive.").

FERC alleges in this case that Defendants did just that—they engaged in otherwise benign virtual trading for a deceptive purpose, thereby violating the FPA. To wit, FERC asserts that Defendants placed UTC trades for the purpose of obtaining MLSA credits instead of price arbitrage. The Court finds that FERC plausibly alleges that conducting these trades violated FPA Section 222 and the Anti-Manipulation Rule.

Specifically, FERC alleges that the purpose of UTC trading is price arbitrage. Compl. ¶ 29 (explaining that UTC trading was "initially created as a tool for traders of physical electricity to hedge congestion price risk associated with physical transactions, and 'later became a way for market participants to profit by arbitraging the price differences between two nodes in the day–ahead and real-time markets'" (quoting Penalty Order ¶ 16)). As FERC explains, "virtual trading products are integrated into, and therefore affect, the price of electricity in the node or region where the trade takes place, as well as what generation units are dispatched by PJM to provide energy to the wholesale grid." Compl. ¶ 28. Accordingly, UTC trades, when conducted for arbitrage, further FERC's core

mission of ensuring "just and reasonable" market rates for electricity, *id.* ¶ 17, because they "promote market efficiency," "increase[] market liquidity and [create] price convergence between the day-ahead and real-time markets," *id.* (alterations in original) (quoting Penalty Order ¶ 15). Moreover, market participants themselves profit from UTC trades by accurately predicting that the price spread between two nodes on the day-ahead and real-time markets will increase. *Id.*

FERC alleges that, "[f]or several years before the summer of 2010," Defendants successfully traded for arbitrage, employing various methods to increase their profits from those trades, under a strategy they referred to as "Spread Strategy." *Id.* ¶¶ 55–57. But from June 2010 to September 2010, FERC alleges, Defendants traded not for the purpose of arbitrage but instead for the "sole or primary purpose" of collecting MLSA credits. *Id.* ¶ 59. FERC asserts that Defendants devised this scheme in early June 2010, after PJM's publication of an MLSA distribution report spurred conversation and research at Coaltrain over how it could increase its profits by obtaining a greater amount of MLSA payments. *Id.* ¶¶ 60–62. These conversations confirmed Defendants' inklings that Coaltrain could make more money by "voluntarily increas[ing] their transmission costs in order to be eligible for MLSA payments," *id.* ¶ 60 (citing Penalty Order ¶ 42), and led to the development of a new trading strategy Coaltrain would name the "OCL Strategy." *Id.* ¶ 36.

FERC explains in detail how Defendants purportedly carried out its OCL Strategy. It asserts that, during the relevant time-period, Defendants made large volumes of, for the most part, unprofitable UTC trades. *Id.* ¶ 35. According to FERC, Defendants would make these trades on specific paths—including SouthImp-Exp and NCMPAImp-Exp (the most lucrative paths) and thirty-eight other paths—on which there was "little or no price spread between the day-ahead and real-time market[s]." *Id.* ¶¶ 37, 62, 64, 84. FERC asserts that Defendants would also pay to reserve transmission for trades placed along those paths, thereby increasing their transaction costs even though "it was not necessary to do so . . . ." *Id.* ¶ 63. FERC asserts this conduct was "[in]consistent with attempting to profit" through arbitrage but "consistent with ensuring eligibility for MLSA payments." *Id.* And, as FERC alleges, Defendants' MLSA profits did substantially increase as a result of the OCL Strategy trades. *Id.* ¶¶ 67, 74, 80, 82. According to FERC, Defendants' alleged scheme to profit from MLSA rather than arbitrage defrauded the market because it deceived PJM into disbursing MLSA credits to Defendants that should have been paid to other market participants, and it tied up transmissions that other market participants could have used for legitimate trading.

FERC contrasts these OCL Strategy trades with Defendants' lawful Spread Strategy trades, which were executed for several years before the summer of 2010. While Defendants' OCL Strategy trades were consistently profitless, their Spread Strategy trades earned Defendants "millions of dollars." *Id.* ¶ 56. The

Spread Strategy trades were successful because they "analyzed constraints in the system (such as out-of-service transmission lines), which create a difference in price between nodes and thus create an opportunity to profit from price arbitrage." *Id.* ¶¶ 56–57 (explaining the methods Defendants employed to make their Spread Strategy trades as profitable as possible).

Moreover, FERC avers, Defendants carried out their OCL Strategy trades knowing full well that they were being executed for the fraudulent purpose of obtaining MLSA credits rather than profiting by arbitrage. Most probative of Defendants' knowledge is FERC's allegation that Coaltrain represented to the Commission that allocating MLSA payments to virtual traders who pay for transmission reservations would not "give market participants perverse incentives to engage in virtual transactions in order to capture a larger share of the surplus. *As always, market participants will conduct virtual transactions when they think they can profit from the difference between the day-ahead LMP and the real-time LMP they expect*," i.e., price arbitrage. Penalty Order ¶ 199 (quoting Financial Marketer, Request for Rehearing, Docket No. EL 10-40-001, at 20 n.23 (filed June 9, 2010) (emphasis added)). Coaltrain gave this assurance at the same time it was purportedly developing its OLC strategy. Compl. ¶ 86.

The Court finds FERC has alleged with sufficient specificity under Rule 9(b)'s heightened pleading standard for fraud that Defendants' conduct violated FPA Section 222 and the Anti-Manipulation Rule.

Defendants' counter-arguments may be distilled down to one premise: they cannot have manipulated the market because nothing about their conduct was inherently wrong. That is, according to Defendants, FERC fails to show that Defendants deceived PJM about the nature of its trades, because even FERC does not dispute that "Coaltrain provided complete and accurate information for each of its transactions to PJM." Coaltrain Mot. 28, ECF No. 25. Defendants assert that, since Coaltrain fully disclosed its trading information to PJM, FERC's theory of liability must be that Defendants were *silent* about their *trading purpose*. But, Defendants argue, based on *Chiarella v. United States*, 445 U.S. 222, 232 (1980) (a securities case), silence is deceptive only in the face of a duty to disclose. And, Defendants assert, no rule required market participants to disclose trading purpose. Therefore, Defendants argue that, because "Coaltrain had no duty to disclose its trading purposes," FERC fails to allege that Defendants committed any deceptive or manipulative act.

This argument distorts the theory of liability asserted here. FERC does not aver that Defendants committed market manipulation because they failed to *disclose* to PJM the true purpose behind their trades. Rather, FERC avers that Defendants manipulated the market by actually *placing the trades* purportedly for the sole or primary purpose of receiving MLSA credits. This is not a fraudulent misrepresentation claim under 18 C.F.R. § 1c.2(b) but instead a fraudulent scheme or course of conduct claim under §§ 1c.2(a) and (b). *See, e.g.*, *SEC v. Geswein*, 2 F. Supp. 3d 1074 (N.D. Ohio 2014) (distinguishing between claims

based on misrepresentation liability and scheme liability under Rule 10b-5).

According to FERC, Defendants' OCL Strategy constituted a "device, scheme, or

artifice to defraud," 18 C.F.R. § 1c.2(a)(1), and an "act, practice, or course of

business that operates . . . as a fraud or deceit upon any entity," *id.* § 1c.2(a)(2),

precisely because of its unlawful purpose to divert MLSA credits from other

market participants and to Defendants instead. This theory of liability is

consistent with the Section 10(b) case law holding that otherwise legitimate

trades made without "any legitimate economic reason[] . . . can constitute market

manipulation." *See, e.g., SEC v. Masri*, 523 F. Supp. 2d 361, 372 (S.D.N.Y

2007) ("Indeed, 'the only definition [of market manipulation] that makes any

sense is subjective—it focuses entirely on the intent of the trader.'" (citation

omitted)); *In re Amaranth Nat. Gas Commodities Litig.*, 587 F. Supp. 2d 513, 534

(S.D.N.Y. 2008) ("[A] legitimate transaction combined with improper motive is . . .

manipulation."); *see also City Power*, 199 F. Supp. 3d at 235 ("*Markowski* [*v.

SEC*, 274 F.3d 525, 529 (D.C. Cir. 2001)] and *Koch* [*v. SEC*, 793 F.3d 147, 152–

56 (D.C. Cir. 2015)] thus reveal an important point: under Section 10(b),

securities traders are not free to trade for whatever purpose they wish. Traders

are presumed to be trading on the basis of their best estimates of a security's

underlying economic value, *see, e.g., ATSI Commc'ns*, 493 F.3d at 100–01, and

to trade for other purposes can be deceptive.").

Defendants also assert that FERC fails to allege market manipulation

because there is nothing inherently wrong with collecting MLSA distributions.

Indeed, Defendants' insist, it is expected that market participants will consider MLSA credits along with all other factors that go into choosing which transactions to make. Defendants point the finger at FERC, stating that *it* was the one that decided in 2009 to explicitly tie MLSA distributions to paid transmission reservations. Defendants aver that when Coaltrain received MLSA credits based on its own paid transmission reservations, it was thus engaging in conduct that FERC itself made permissible.

Yet again, Defendants' argument misses the mark. It is not Defendants' mere collection of MLSA credits that FERC asserts was unlawful. It was Defendants' purported scheme to place UTC trades for the sole or primary purpose of obtaining those credits. For reasons already explained, such a scheme, if proved, would constitute market manipulation under FPA Section 222 and the Anti-Manipulation Rule. *Cf. ATSI Commc'ns*, 493 F.3d at 101.

Next, Defendants argue that FERC cannot state a market manipulation claim because its theory of liability requires it to show Defendants' UTC trades fell below a certain level of risk, but FERC has no rule or regulation requiring trades to carry a certain minimum level of risk. In other words, Defendants contend that FERC claims their trades were deceptive solely because they weren't "risky enough."

This argument also fails because it is based on a distorted view of FERC's allegations. Again, FERC's theory of liability is not based on risk but, rather, purpose. The fact that Coaltrain's UTC transactions carried little to no risk does

not, on its own, prove market manipulation, although it certainly provides *evidence* of such. Indeed, it was this evidence that aroused PJM's suspicions and triggered FERC's investigations. The conclusion of those investigations was not simply that Defendants placed low- to no-risk trades but that they place those trades purportedly to profit from MLSA.

Finally, Defendants aver that FERC fails to state a claim because it does not allege any harm resulting from the purported scheme that is connected to electricity prices. They assert that FERC's allegations that Defendants caused PJM to divert MLSA payments from other market participants is an insufficient harm to support a market manipulation claim under the FPA because the only type of manipulation prohibited under the statute is that which impacts the price of electricity. Coaltrain Mot. 32, ECF No. 25 (quoting *Santa Fe Indus.*, 430 U.S. at 477). Any other harm, Defendants argue—"such as upsetting the MLSA distribution or 'tying up' transmission service—does not fall within the ambit of the statute." *Id.*

This argument also fails. As an initial matter, it is not clear FERC even needs to allege harm to bring its claim. *See Familant*, 910 F. Supp. 2d at 92 ("[U]nlike a plaintiff in a private damages action, the SEC need not prove actual harm" to bring a securities fraud enforcement action.) (citation omitted) (alteration in original)); *see also City Power*, 199 F. Supp. 3d at 237 ("[W]hy must FERC allege harm? The SEC need not show harm when it brings an enforcement action under Rule 10b-5." (citation omitted)).

Regardless, Defendants espouse too narrow a view of harm by obfuscating the difference between the securities and the electricity markets. "The energy industry is not in all ways equivalent to the securities industry." *Barclays Bank PLC, et al.*, 144 FERC ¶ 61,041, at ¶ 61,219 (July 16, 2013). Because SEA Section 10 (and Rule 10b-5) prohibits fraud "in connection with the purchase or sale of any security," 15 U.S.C. § 78j(b), it makes sense that conduct at issue in Rule 10b-5 cases would deal with conduct alleged to have manipulated the price of the security being purchased or sold. FPA Section 222 (and the Anti-Manipulation Rule), however, prohibits fraud "in connection with the purchase or sale of electric energy *or the purchase or sale of transmission services* . . . ." 16 U.S.C. § 824v(a) (emphasis added). The fraudulent conduct alleged in this case has precisely to do with "the purchase or sale of transmission services," in that Defendants purportedly paid to reserve transmissions in furtherance of virtual trades made for the sole purpose of obtaining MLSA credits. They thereby allegedly obtained "more than $8 million in MLSA that ought to have been distributed to other market participants." Resp. 39 (citing Penalty Order ¶¶ 47,303). And they allegedly tied up transmission services that could have been used by other market participants for virtual or electrical trades. Compl. ¶ 31. Finally, FERC alleges that, in this case, the MLSA credits that PJM paid to Coaltrain that purportedly should have gone to other market participants meant that "entities operating or headquartered in this District . . . lost approximately $1.4 million, and Ohio consumers were harmed because they

would have received some of this money under state law and regulations." *Id.* ¶ 15(5). These alleged harms are sufficient to support FERC's claims.

### 4. Defendants had notice their "OLC Strategy" trades would be considered fraudulent

Defendants next argue that they had no notice that their conduct would be considered unlawful, because, prior to bringing its enforcement action against Defendants, FERC had never informed the public that it would consider financial transactions made for the sole or primary purpose of profiting from MLSA unlawful.

The Court is not persuaded. Although the Anti-Manipulation Rule does not specifically define every type of scheme that will be considered fraudulent, it places market participants on notice that conduct intended to impair, obstruct, or defeat a well-functioning market would be considered fraudulent and that whether conduct is fraudulent would be considered on a case-by-case basis upon full consideration of the facts. 114 FERC ¶ 61,047, at ¶ 50. It is not hard to see how trading only for the benefit of MLSA credits subverts a well-functioning market. As FERC's allegations make clear, the transmission reservations necessary to make those trades render unavailable those same transmission lines for other trades—both physical and financial. And because MLSA credits are distributed on a pro rata share, logically, traders who place larger volumes of MLSA trades will receive a larger share of the MLSA credits—regardless of whether the eligible trades were made for arbitrage to the market's benefit.

Defendants seem to think that, in order to give them fair notice, FERC had to be more explicit that it would not tolerate trades made solely for the purpose of obtaining MLSA. Defendants aver that FERC addressed this very issue of trading for MLSA in a series of orders, called the "*Black Oak*" orders, and did not condemn such trading outright. They further contend that FERC acknowledged in other orders that market participants would consider MLSA, as they would consider all factors, when determining whether their trades would be profitable.

The court in *City Power* recently addressed a similar argument and explained:

> FERC's present view of virtual UTC trading, moreover, is consistent with what it said in the 2008 *Black Oak* orders. There FERC described UTCs as "arbitrage transactions" and the virtual traders engaged in them as "arbitrageurs." 122 FERC ¶ 61,208 at P 50 & n. 85. In those same orders, FERC expressed clear disapproval of the possibility that virtual traders might seek to profit by simply maximizing MLSA instead of reacting to price differences. *Id.* at P 51; 125 FERC ¶ 61,042 at PP 38 n.46, 43. And FERC has plausibly alleged that City Power "understood the arbitrage-based purpose of UTC trading in PJM." Penalty Assessment Order at P 181; *see also id.* at PP 182–86 (cataloging evidence of City Power's knowledge that loss trading was inconsistent with the purpose of UTC trading).

*City Power*, 199 F. Supp. 3d at 235.

The Court agrees with *City Power*'s analysis of the *Black Oak* orders and FERC's statements therein. FERC's "clear disapproval" of trading for the purpose of obtaining MLSA along with its numerous statements (and the common understanding in the industry) that financial trades are designed for

arbitrage demonstrates that Defendants did have notice that the OCL Strategy trades alleged here would be considered unlawful.

### 5. FERC's Anti-Manipulation Rule falls within FERC's regulatory authority[7]

Defendants next assert that FERC's Anti-Manipulation Rule exceeds FERC's regulatory authority, both facially and as applied to this case. Defendants' basic premise is that the Anti-Manipulation Rule broadly defines "fraud" to encompass any conduct, even if not manipulative or deceitful, that seems to subvert a "well-functioning market." *See* 114 FERC ¶ 61,047, at ¶ 50 ("The Commission defines fraud generally, that is, to include any action, transaction, or conspiracy for the purpose of impairing, obstructing or defeating a well-functioning market.").

Defendants spend little time elaborating on this argument, and the Court does likewise in dismissing it. Briefly, the Court reiterates that Section 222 of the FPA expressly states that it uses the phrase "manipulative or deceptive device or contrivance" as it is used by Section 10(b) of the SEA. *See* 16 U.S.C. § 824v(a). The Securities and Exchange Commission ("SEC") promulgated its market manipulation rule, Rule 10b-5, pursuant to the statutory authority granted it by

---

[7] In the majority of their arguments, Defendants specifically assert that the definition of "fraud" in the Anti-Manipulation Rule exceeds FERC's authority and is unconstitutionally vague. But the definition of "fraud" is not a freestanding rule that Defendants are charged with violating; rather, they are alleged to have violated the Anti-Manipulation Rule itself. Accordingly, the Court construes Defendants' arguments to be that the definition of "fraud" in the Rule causes the *Rule itself* to exceed the bounds of its delegated authority and makes it unconstitutionally vague.

SEA Section 10(b) to regulate the use of a manipulative or deceptive device or contrivance in the securities market. As a result, in promulgating the Anti-Manipulation Rule, FERC properly relied on Rule 10b-5 to guide its interpretation of its own authority pursuant to Section 222 to regulate the use of a manipulative or deceptive device or contrivance in the wholesale electricity market. *See* 114 FERC ¶ 61,047, at ¶¶ 49–50 ("The[] elements [of SEC Rule 10b-5] offer useful guidance as to how [FERC] will apply [the Anti-Manipulation] Rule."). Moreover, FERC explained in its Anti-Manipulation Rule that Section 222 permitted the agency "to adapt analogous securities precedents as appropriate to specific facts, circumstances, and situations that arise in the energy industry, " *id.* at ¶ 30, but acknowledged that "the roles of the Commission and the SEC are not identical" and, therefore, that it may not always be appropriate to adopt securities precedent to circumstances specific to the energy market. *Id.* at ¶ 31.

Consistent with its own statutory command to ensure "just and reasonable" rates "in connection with the transmission or sale of electric energy . . . ." 16 U.S.C. § 824d(a), then, FERC's definition of "fraud" focuses on conduct designed to subvert "a well-functioning market." 114 FERC ¶ 61,047, at ¶ 50. Defendants fail to elaborate how FERC's Anti-Manipulation Rule unreasonably interprets the scope of its delegated regulatory authority to prevent energy market manipulation pursuant to 16 U.S.C. § 824v. *See Chevron, USA, Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 844–45 (1984). The Court finds the Rule entirely consistent

with the authority granted to the Commission by its authorizing statute to regulate market manipulation.

### 6. The Anti-Manipulation Rule is not unconstitutionally vague

Defendants offer one more reason why the Court should dismiss FERC's case: the Anti-Manipulation Rule is unconstitutionally vague.[8] "A conviction or punishment fails to comply with due process if the statute or regulation under which it is obtained 'fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement.'" *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) (citation omitted). "[A] regulation is not vague because it may at times be difficult to prove an incriminating fact but rather because it is unclear as to what fact must be proved." *Id.* In other words, "[a] rule or regulation is unconstitutionally vague if it misleads the individuals it regulates into thinking that their conduct is not proscribed." *Libertarian Party of Ohio v. Husted*, 751 F.3d 403, 421 (6th Cir. 2014) (citation omitted).

In contending that the Rule is unconstitutionally vague, Defendants reiterate their argument that FERC has not delineated a minimum risk-level that

---

[8] Defendants contend that the Rule is vague both facially and as applied. Their facially vague challenge fails, however, because "when applying the void-for-vagueness doctrine outside of the First Amendment context, the relevant inquiry is . . . 'whether a statute is vague *as applied to the particular facts at issue*,' for a defendant 'who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others.'" *Silkman*, 177 F. Supp. 3d at 703 (emphasis added) (quoting *Holder* v. *Humanitarian Law Project*, 561 U.S. 1, 18–19 (2010)).

transactions must carry to be legitimate. *See* Coaltrain Mot. 35, ECF No. 25 ("Neither the FPA nor the Anti-Manipulation Rule state that transactions must carry a certain non-zero minimum level of risk, and FERC offers no explanation for what that minimum level might be, or for how a market participant might discern it."). The Court rejects this argument for the same reason it did above: FERC's theory of liability in this case is not that Defendants' trades were not risky enough; it is, instead, that Defendants place a high volume of profitless UTC trades in order to obtain a higher portion of MLSA credits. But Defendants' argument fails for the additional reason that two considerations limit the applicability of the void-for-vagueness doctrine to this case: Defendants are sophisticated parties, *Silkman*, 177 F. Supp. 3d at 702 ("[T]he doctrine is applied more leniently in the sphere of economic regulation of sophisticated parties." (citations omitted)), and FERC must prove that Defendants acted with scienter in order to succeed on its claims, *id.* ("[A]ny potential vagueness is balanced by the scienter requirement necessary to find a violation of FPA Section 222 and the Anti-Manipulation Rule." (citation omitted)); *see also Peoples Rights Org., Inc. v. City of Columbus*, 152 F.3d 522, 534 (6th Cir. 1998). Consequently, Defendants' void-for-vagueness arguments fail.

### 7. Sheehan and Miller's participation in the fraudulent scheme

Sheehan and Miller contend that they did not engage in any OCL Strategy transactions and that the Complaint alleges only that they played a key role in developing OCL Strategy, including researching, designing, and implementing

the strategy. Sheehan and Miller argue that, even if true, those allegations do not amount to primary violations of Section 222 of the FPA. They argue that FERC may only prosecute primary violations, not secondary violations such as aiding and abetting. Sheehan and Miller contend this limitation on liability for only primary violations is supported by the plain meaning of the statute, case law interpreting nearly identical language under the SEA, and the only case to discuss this issue with respect to the Section 222 of the FPA. Thus, Sheehan and Miller contend that their actions, even as alleged by FERC, are not violations of the Anti-Manipulation Rule because they did not execute any of the UTC trades. Miller Mot. 10–11, ECF No. 26.

FERC responds that Sheehan and Miller are primary violators. It argues that the Complaint alleges that Sheehan designed, implemented, and directed the OCL Strategy. Further, it alleges that Sheehan colluded with other employees to create after-the-fact explanations for the strategy during the investigation. Moreover, FERC asserts that the Complaint alleges that Sheehan did actually execute some of the manipulative trades and that Miller not only researched and designed the OCL Strategy with Sheehan but also directed traders to execute the fraudulent trades pursuant to that strategy. Thus, FERC contends, in the event such action is necessary for liability, it is actually alleged and FERC therefore states a claim against them. Resp., ECF No. 31.

At the risk of redundancy, the Court reiterates Section 222 of the FPA, which states that "[i]t shall be unlawful for any entity . . . directly or indirectly, to

use or employ, in connection with the purchase or sale of electric energy . . . any manipulative or deceptive device or contrivance (as those terms are used in section 78j(b) of Title 15), in contravention of such rules and regulations as the Commission may prescribe . . . ." 16 U.S.C. § 824v(a). The pertinent portions of the Anti-Manipulation Rule state that "[i]t shall be unlawful for any entity, directly or indirectly . . . [t]o use or employ any device, scheme, or artifice to defraud," 18 C.F.R. § 1c.2(a)(1), or to "engage in any act, practice, or course of business that operates . . . as a fraud or deceit upon any entity," *id.* § 1c.2(a)(3). As previously stated, to determine what is prohibited by the Rule, the Court first turns to the language of its authorizing statute, 16 U.S.C. § 824v. *See Santa Fe Indus.*, 430 U.S. at 472. And under the plain language of the statute, and thus the Rule, the only conduct that is prohibited is the actual "use" or "employment" of a manipulative or deceptive device, scheme, or artifice, 18 C.F.R. § 1c.2(a)(1), or the actual "use" or "employment" of a manipulative or deceptive "act, practice, or course of business," *id.* § 1c.2(a)(3).

This reading of the statute and rule is consistent with the Supreme Court's conclusion in *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994). In that case, the Supreme Court interpreted virtually identical language contained in § 10(b) of the SEA and the misstatement provision in Rule 10b-5[9] as not reaching those who only aid or abet a violation.

_____

[9] Section 10b of the SEA is almost identical to Section 222 of the FPA and states, "It shall be unlawful for any person . . . [t]o use or employ . . . any manipulative or

*Id.* at 177.  Rather, the Court concluded, § 10(b) (as it relates to a violation of the misstatement provision of the rule) covered "only the making of a material misstatement (or omission) or the commission of a manipulative act" and did "not include giving aid to a person who commits a manipulative or deceptive act." *Id.* As Section 222 and § 10(b) are nearly identical in language, the Court finds *Central Bank* instructive—if not dispositive—of the issue in this case.[10]  That is, just as only the "making" of a material misstatement (or omission) suffices for primary liability under Rule 10b-5(b), only the "use" or "employment" of a scheme

---

deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe . . . ." 15 U.S.C. §78j.  The portion of the SEA anti-manipulation rule at issue in the *Central Bank* case states, "[it] shall be unlawful for any person, directly or indirectly . . . [t]o make any untrue statement of a material fact or to omit to state a material fact . . . ." 17 C.F.R. § 240.10b-5.

[10] Despite FERC's attempt to distinguish *Central Bank*, it matters not that *Central Bank* was decided in the context of a private cause of action.  The issue presented was the scope of conduct prohibited by §10(b), *id.* ("The issue, however, is not whether imposing private civil liability on aiders and abettors is good policy but whether aiding and abetting is covered by the statute."), the majority's decision was a broad pronouncement that the text of the statute did not prohibit aiding and abetting, *id.*, and the minority itself recognized that "[t]he majority [left] little doubt that the Exchange Act does not even permit the SEC to pursue aiders and abettors in civil enforcement actions under § 10(b) and Rule 10b-5." *id.* at 200 (Stevens, Blackmun, Souter, and Ginsburg, JJ., dissenting).  Accordingly, *Central Bank* is not inapposite merely because it was considered in the context of a private cause of action.

      Nor is it important that *Central Bank* considered the misstatement provision of the SEA (Rule 10b-5(b)), while this case involves the prohibition of fraudulent devices and schemes.  The take away from *Central Bank* is that 15 U.S.C. § 78j does not prohibit aiding and abetting but rather only primary violations.  The analogy, then, is that 16 U.S.C. § 824v does not prohibit aiding and abetting but rather only primary violations. That is true regardless of whether the violation is for subsection (1), (2), or (3) of the corresponding Rule.  *Cf. Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135, 143 (2011) (stating that a broader reading of the rule would "substantially undermine *Central Bank*" by erasing virtually any distinction between primary violators and aiders and abettors).

or course of business to defraud suffices for primary liability under 18 C.F.R. § 1c.2(a)(1).

Moreover, the only case that has considered the issue in the context of Section 222 and the Anti-Manipulation Rule has likewise concluded that Section 222 reaches only primary violators and does not reach aiding and abetting. *Silkman*, 177 F. Supp. 3d at 707 ("[I]n enacting FPA Section 222 and the Anti-Manipulation Rule, Congress and FERC can be presumed to have limited the reach of those provisions to primary violators."). And while Congress subsequently specifically granted the SEC authority over aiding and abetting violations in the SEA, it has added no analogous section in the FPA that would grant FERC authority over aiding and abetting violations. Thus, the Court agrees with Sheehan and Miller that only primary violations of the anti-manipulation rule are actionable.

FERC contends that it has stated a claim against Sheehan and Miller because it has alleged that they are primarily liable. Specifically, FERC asserts that devising the manipulative scheme is sufficient to impose primary liability. *Silkman* appears to be the only case in the country to have addressed this issue, and *Silkman* held that the creation of a fraudulent scheme is not sufficient to impose primary liability. 177 F. Supp. 3d at 708 (finding that hatching the scheme and presenting it to another to be executed by the other is an insufficient basis for imposing primary liability and that "where a party only devises a scheme to defraud . . . and assists another in executing it, it is that other party who is

actually perpetrating a fraud . . . .  The assisting party is only an aider and abettor

beyond the reach [of] the statutory scheme.").  *Silkman* stated that the actor must

have participated in the actual execution of the fraudulent scheme for primary

liability to attach.  *See id.*

This Court agrees with *Silkman's* holding as it is consistent with *Central*

*Bank* and the plain text of the statute.  That is, under the scheme theory of

liability, the prohibited action is the "use" or "employment" of the scheme, not the

"development" or "creation" of the scheme.  One cannot use or employ

something that does not exist, which suggests that those verbs do not

encompass the creation of the thing being used or employed.  In other words,

developing a scheme to defraud is different than using a scheme to defraud.

Logically, the scheme must be conceived of and planned out before it can be

executed, and the plain language of the statute and rule appear to prohibit only

the execution of the scheme.[11]  As such, FERC does not state a claim against

Sheehan and Miller for violating the Anti-Manipulation Rule by developing,

strategizing about, researching, or designing the OCL scheme.[12]  *See* Compl.

¶ 95.

---

[11] Or, in § 1c.2(a)(3) terms, conceiving of a fraudulent act, practice, or course of
business is distinct from actually "engaging in" or using and employing it.
[12] The cases FERC cites do not undermine this conclusion.  The Court has reviewed the
cases FERC cites, as well as others, which, in the context of SEA scheme liability,
seem to state that creation or instigation of a fraudulent scheme is sufficient to impose
primary liability under § 10b and Rule 10b-5(a) and (c).  However, in the vast majority—
if not all of those cases—the defendant actually did directly or indirectly participate in
the execution of the fraudulent scheme.  For example, FERC cites *SEC v. Sierra
Brokerage Servs.*, 608 F. Supp. 2d 923 (S.D. Ohio 2009), *aff'd*, 712 F.3d 321 (6th Cir.

On the other hand, actually making the OCL Strategy trades oneself is not the only manner in which one could use or employ the OCL Strategy trading scheme. As FERC points out, its Complaint alleges that Miller made the decisions to execute certain OCL Strategy trades. *See id.* ¶ 98. Moreover, FERC argues that it does allege that Sheehan himself made some of the trades. *id.* ¶ 95. The Court agrees.

With respect to Miller, the Complaint does not allege that he actually executed any of the OCL Strategy trades, and the Order assessing penalties explicitly acknowledges that Miller did not execute any of the OCL Strategy trades. Penalty Order ¶ 340. However, the Complaint alleges that Miller "participated in decisions to execute OCL Trades." Compl. ¶ 98. The Order assessing penalties states more forcefully that Miller *directed* traders to execute OCL Strategy trades, Penalty Order ¶¶ 257, 349, although at other places it states that he *recommended* that others execute such trades. *Id.* Because the Complaint alleges that Miller partook in the decision to execute specific OCL Strategy trades, which allegation is not contradicted by the Order assessing

2013), for the proposition that one need not buy or sell securities himself to be primarily liable for a § 10b or Rule 10b-5 market manipulation claim. Judge Marbley's statement in that case, however, was that primary liability can attach to those who do not buy and sell securities but who nonetheless have knowledge of the fraud *"and assist[] in its perpetration." Id.* at 962 (emphasis added); *see also S.E.C. v. Simpson Capital Mgmt., Inc.,* 586 F. Supp. 2d 196 (S.D.N.Y. 2008) (finding primary liability attaches in fraudulent scheme cases to those who participate in the fraudulent scheme and finding that the defendants participated in the fraudulent scheme by submitting proposed trades to broker-dealers before a certain time but authorizing the traders after the market closed). Likewise here, FERC needs to allege that Miller and Sheehan were involved in the perpetration of the fraudulent scheme in order to allege primary liability—not merely that they devised the scheme.

penalties, the Complaint sufficiently alleges that Miller participated in the execution of the fraudulent scheme. In other words, it alleges that Miller at least indirectly "used" or "employed" the OCL trading scheme by helping choose (or mandating) which OCL Strategy trades would be executed. This is sufficient to state a claim against Miller for primary liability.

With respect to Sheehan, FERC alleges that Sheehan executed some of the OCL Strategy trades himself. Compl. ¶ 95. While this should end the matter, Sheehan argues that FERC fails to state a claim because that allegation is unsupported by *evidence*, which is not the standard applied by the Court at the motion to dismiss stage. Sheehan cites the Order assessing penalties for the proposition that Sheehan submitted certain trades under the Spread Strategy— which FERC admits is not manipulative—and that someone re-coded those trades as OCL Strategy trades after the fact. What the Order actually says is that Coaltrain submitted responses to data requests, which were sworn to by P. Jones, affirming that Sheehan submitted 7,700 MWh of OCL Strategy trades. Penalty Order ¶ 175. The response further stated that Sheehan labeled those trades as Spread Strategy trades but that Coaltrain did not yet have an internal label for OCL Strategy trades at the time Sheehan made those trades or chose the label. *Id.* Thus, the Order does not contradict the allegations made in the Complaint and in fact supports it. *See id.* ¶ 11. Whether Sheehan actually engaged in OCL Strategy trades is a matter for another day; FERC has

sufficiently stated a claim for primary liability against Sheehan under the Anti-Manipulation rule by alleging that he did so.

Accordingly, Sheehan's and Miller's motion to dismiss on the basis that they did not execute any OCL Strategy trades is denied.

### 8. Scienter

Defendants P. Jones, R. Jones, and Wells contend that FERC's market manipulation claim fails because it does not sufficiently allege scienter.

Notwithstanding Federal Rule of Civil Procedure 9(b)'s heightened pleading standard for fraud, allegations concerning state of mind are held to the pleading standards of Rule 8(a). *Peters v. Monroe Twp. Bd. of Trustees*, No. 2:11–cv–83, 2011 WL 3652719, at *6 (S.D. Ohio Aug. 18, 2011) (citations omitted). Nevertheless, "allegations of fraudulent misrepresentation must be made with a sufficient factual basis to support an inference that they were knowingly, or recklessly[,] made." *In re SmarTalk Teleservices*, 124 F. Supp. 2d at 536. Accordingly, mere legal conclusions will not suffice; FERC must also plead facts which make the allegations plausible. *Schatz v. Rep. State Leadership Comm.*, 669 F.3d 50, 58 (1st Cir. 2012) ("[T]o make out a plausible malice claim, a plaintiff must still lay out enough facts from which malice might reasonably be inferred—even in a world with *Twombly* and *Iqbal*."); *Mayfield v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*, 674 F.3d 369, 377–78 (4th Cir. 2012); *Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1327 (Fed. Cir. 2009) ("[O]ur precedent, like that of several regional circuits, requires that the

pleadings allege sufficient underlying facts from which a court may reasonably infer that a party acted with the requisite state of mind.").

According to FERC's Order adopting the Anti-Manipulation Rule, "recklessness satisfies the scienter element of the [Anti-Manipulation] Rule." 114 FERC ¶ 61,047, at ¶ 53. Because securities precedent guides the interpretation of the FPA, the Court notes that FERC's recklessness standard for scienter under the FPA is consistent with the recklessness requirement under the SEA. As the Sixth Circuit has held, in securities fraud actions, "[s]cienter may be established by proof of recklessness—'highly unreasonable conduct which is an extreme departure from the standards of ordinary care.'" *SEC v. George*, 426 F.3d 786, 792 (6th Cir. 2005) (quoting *Mansbach v. Prescott, Ball & Turben*, 598 F.2d 1017, 1025 (6th Cir.1979)); *see also* 114 FERC ¶ 61,047, at ¶ 53 n.109 (noting that the Sixth Circuit "appl[ies] a 'severely reckless' or action with 'conscious disregard' of the problem or risk standard" in securities fraud actions and citing *In re Comshare, Inc. Securities Litig.*, 183 F.3d 543 (6th Cir. 1999) in support of that standard).

The scienter inquiry relates to whether Defendants "intended to take certain actions and knew the consequences of such actions," not that they "intended to break the law." Penalty Order ¶ 242, n.662 (citing *Pittsburgh Terminal Corp. v. Balt. & Ohio R.R. Co.*, 680 F.2d 933, 942 (3d Cir. 1982) ("A violation of Section 10(b) does not require a specific intention to break the law. It requires only knowing or intentional actions which, objectively examined, amount

to a violation."); *SEC v. Falstaff Brewing Corp.*, 629 F.2d 62, 77 (D.C. Cir. 1980) ("Knowledge means awareness of the underlying facts, not the labels that the law placed on those facts. Except in very rare instances, no area of the law not even the criminal law demands that a defendant have thought his actions were illegal. A knowledge of what one is doing and the consequences of those actions suffices."). R. Jones, P. Jones, and Wells attempt to shift the inquiry away from what Defendants' knew about their conduct to what Defendants' knew about the law. Their arguments against scienter thus focus on Defendants' purported understanding of the law at the time they executed their trades and whether FERC provided sufficient notice that their conduct would constitute fraud. *See* Jones Mot. 17, ECF No. 23 ("Having opined only after the fact that UTC transactions conducted for the purpose of obtaining credits were unlawful, FERC cannot define scienter as the intent to obtain the credits."); Jones Reply 6, ECF No. 33 ("FERC fails, however, to allege facts establishing that Defendants contemporaneously were aware that such transactions would be considered manipulative and purposefully executed them anyway."). But the scienter requirement asks not whether Defendants intended to break the law but instead whether they intended to engage in the alleged conduct.[13]

---

[13] Moreover, the Court already found above that Defendants had notice that trading for the sole or primary purpose of obtaining MLSA would be considered market manipulation.

Accordingly, FERC's allegations must set forth facts supporting a plausible inference that P. Jones, R. Jones, and Wells[14] recklessly or knowingly participated in a fraudulent scheme to trade UTCs for the sole or primary purpose of obtaining MLSA. FERC's allegations allow for such a plausible inference. FERC's allegations point to direct and circumstantial evidence that the Commission found indicative of each Defendant's intentional participation in the purported fraudulent scheme. *See New England Health Care Emps. Pension Fund v. Ernst & Young, LLP*, 336 F.3d 495, 502 (6th Cir. 2003) ("[D]irect evidence of scienter is not necessary to a determination of fraud.").

That evidence includes Defendants' contemporaneous statements and actions confirming that their OCL Strategy was aimed solely or primarily at collecting MLSA payments. Compl. ¶ 89; Penalty Order ¶¶ 222–26. The Commission cited to the following contemporaneous evidence specific to P. Jones, R. Jones, and Wells:

> [O]n July 2, 2010, **Mr. Robert Jones** proposed conducting a "meg tester for a high load/high loss credit day" on NCMPAImp-Exp, suggesting a test to confirm the trade would yield high loss credits. Mr. Miller responded "Ok," and **Mr. Peter Jones** responded, "good with this." Coaltrain went on to trade the NCMPAImp-Exp path for 17 days starting on July 8, 2010. In yet another example, on August 12, 2010, **Mr. Wells** recommended a trade to **Mr. Peter Jones**, explaining, "it goes up and down but it averages out never losing a lot or making a lot, *hence a very good OCL play*."

---

[14] Because only these Defendants argue that FERC fails to present sufficient factual allegations going to scienter, the Court considers whether scienter is met with respect to them only.

Penalty Order ¶ 225 (last emphasis in original) (footnotes omitted). The Penalty

Order also notes that Defendants flagged trades as "OCL" in their computer

application to distinguish those trades from those not made for the purpose of

obtaining MLSA. *Id.* at ¶ 226. Additionally, FERC alleges that Defendants'

pattern of OCL Strategy trading reflects scienter in three primary ways:

(1) Defendants voluntarily and unnecessarily increased transaction costs for OCL

Strategy trades to make a higher number of trades eligible for MLSA

disbursement; (2) Defendants traded a significantly higher number of OCL

Strategy trades than non-OCL Strategy trades; and (3) Defendants made OCL

Strategy trades during "peak periods of high load when MLSA payments tended

to be at their highest." Compl. ¶ 90; Penalty Order ¶¶ 227–29. These

allegations, along with several others that the Court need not recite here, are

sufficient to give rise to an inference that Defendants P. Jones, R. Jones, and

Wells all intentionally participated in a scheme to place virtual trades for the sole

or primary purpose of obtaining MLSA credits.[15]

---

[15] The Penalty Order also inferred scienter as to all Defendants based on Coaltrain's
assurances in a Complaint before the Commission that changing the rules to allow
virtual traders to receive MLSA disbursements based on paid transmission reservations
would not create the perverse incentive to trade only for the purpose of obtaining MLSA
credits. Penalty Order ¶ 230. Defendants contend that FERC cannot rely on the
Coaltrain Complaint as evidence of intent because it does not allege that P. Jones, R.
Jones, or Wells "knew of, read, understood, or had anything at all to do with the footnote
in the brief" that makes assurances to the Commission that virtual traders will not trade
for the sole purpose of obtaining MLSA if they are allowed to receive MLSA for placing
paid transmission reservations. Jones Mot. 19, ECF No. 23. The cases they cite to in
support of this argument, however, are inapposite here. Two of those cases—
*Southland Sec. Corp. v. INSpire Ins. Sol., Inc.*, 365 F.3d 353, 365 (5th Cir. 2004) and *In
re Huffy Corp. Sec. Litig.*, 577 F. Supp. 2d 968, 986 (S.D. Ohio 2008)—apply a

Defendants counter that FERC's intent standard is "irreparably vague," because determining whether virtual trades were conducted for the "sole or primary purpose" of obtaining MLSA credits involves "a metaphysical inquiry entailing an extraordinary level of subjectivity and sowing an extraordinary amount of confusion." Jones Mot. 20, ECF No. 23. They assert that FERC's intent standard is "[p]articularly problematic" because it does not clarify the extent to which MLSA credits may be considered when conducting a UTC transaction. *Id.* at 21. The Court already rejected this argument above, but it bears repeating that the manipulative conduct is not the placing of a "low-risk" UTC trade in and of itself—the trades and the circumstances in which they were made simply constitute evidence of the overarching manipulative scheme. The Court is thus unpersuaded by this argument and finds that FERC sufficiently alleges facts giving rise to a plausible inference of scienter.

For all of these reasons, the Court finds that FERC stated a claim against all Defendants for violations of FPA Section 222 and the Anti-Manipulation Rule and Defendants motions to dismiss this claim are **DENIED**.

---

heightened pleading standard to allegations of scienter (requiring facts giving rise to a "strong inference" of scienter) in private securities actions in accordance with § 10 of the Private Securities Litigation Reform Act of 1995 ("PSLRA"). The PSLRA is inapplicable to the FPA, and Defendants have cited to no law requiring a heightened pleading standard for scienter in the context of the FPA. The other case Defendants cite—*Grady v. Gen. Motors Corp.*, No. 98-4251, 1999 WL 825045, at *4 (6th Cir. Oct. 8, 1999)—has no bearing here because it deals with a particular Ohio law requiring a defendant's "active participation" for liability for failure to warn.

### 9. Joint and several liability for violations of the Anti-Manipulation Rule

Finally, Sheehan and P. Jones argue that joint and several liability is not an available remedy against them for the market manipulation violation under the FPA. They contend that the FPA does not provide for penalties or disgorgement on a joint and several basis and that, even if it did, joint and several liability is not available for punitive damages, is inappropriate where the alleged contributions to a violation can be apportioned among parties, and is preempted by state laws that specify the liability of partners in a limited partnership or members of an LLC for debts of the organization.

FERC responds that joint and several liability is proper with respect to both the disgorgement and civil penalty assessed against Coaltrain even in the absence of specific statutory language authorizing such liability. Indeed, FERC contends that it has the power to assess joint and several liability *absent* contrary statutory language so long as such assessment of penalties is in the interests of justice. FERC further contends that Sheehan and P. Jones had a close relationship to the illegal conduct, which, it says, is sufficient in this District to find defendants jointly and severally liable for disgorgement. FERC further contends that it is impossible to apportion liability in this case, making joint and several liability appropriate and that Delaware law does not prevent the imposition of joint and several liability.

This debate is premature. That is, even if Defendants are correct, "that conclusion would not compel the dismissal of any of FERC's claims. It would only impact the remedy the Court would order *if* it ultimately finds that [Coaltrain] is liable." *City Power*, 199 F. Supp. 3d at 243. Accordingly, the Court declines to rule on this issue at this juncture of the proceeding.

### E. Count Two: Violations of 18 C.F.R. § 35.41(b) (the Rule of Candor)

FERC also alleges that Coaltrain violated 18 C.F.R. § 35.41(b), which requires Sellers to "provide accurate and factual information and not submit false or misleading information, or omit material information, in any communication with the Commission . . . unless Seller exercises due diligence to prevent such occurrences." FERC alleges Coaltrain violated this Rule by making false and misleading statements regarding the accuracy and completeness of its disclosures to the Commission during its investigations and by omitting material information regarding the existence of the company's Spector 360 records that proved essential to the Commission's investigations. FERC moreover asserts that Coaltrain failed to exercise due diligence in ensuring that these communications were accurate. In this action, FERC seeks approval of its penalty assessment against Coaltrain, Sheehan, and P. Jones that makes them jointly and severally liable for Coaltrain's violations of the Rule of Candor.

### 1. Whether FERC alleges a cognizable claim for violations of 18 C.F.R. § 35.41(b)

Coaltrain first asserts that FERC's claim against it for violations of § 35.41(b) is not justiciable because the Commission chose not to assess a penalty for violations of that rule in the proceedings below. This assertion is patently false. A review of the Commission's Penalty order reveals that after the Commission found Coaltrain liable for violating § 35.41(b) (and thoroughly explained its basis for that finding), Penalty Order ¶¶ 258–87, it assessed a combined civil penalty against Coaltrain (for which it held Defendants Sheehan and P. Jones jointly and severally liable) that accounted for Coaltrain's violations of both the Anti-Manipulation Rule and § 35.41(b), *id.* ¶¶ 325–32. Coaltrain posits that FERC should have "separately assessed [a] penalty for the 35.41(b) violations" instead of imposing a combined penalty based on violations of § 35.41(b) and the Anti-Manipulation Rule together. *See* Coaltrain Mot. 47, ECF No. 25 ("FERC adopted . . . [a] $26 million civil penalty against Coaltrain . . . without imposing a *separate* penalty for the alleged section 35.41(b) violation." *Id.* (internal quotation marks omitted) (emphasis added). But Coaltrain points to no case law, statute, regulation, or policy that required FERC to assess its penalties separately in order to state a claim. Ultimately, Coaltrain's arguments on this point belie the record and fail to convince the Court that the manner in which FERC assessed civil penalties divests this Court of its broad "authority to review de novo the law and facts involved, and . . . to enter a judgment enforcing,

modifying, and enforcing as so modified, or setting aside in whole or in [p]art such assessment." 16 U.S.C. § 823b(d)(3).

### 2. FERC's authority to promulgate the 18 C.F.R. § 35.41(b)

Defendants next aver that 18 C.F.R. § 35.41(b) exceeds FERC's statutory authority. Ascertaining FERC's authority is a matter of statutory interpretation, because "an agency literally has no power to act . . . unless and until Congress confers power upon it" by statute. *Calif. Indep. Sys. Operator Corp. v. FERC*, 372 F.3d 395, 399 (D.C. Cir. 2004) (citation omitted).[16] Accordingly, the Court's analysis begins with the FPA.

FERC promulgated 18 C.F.R. § 35.41(b) pursuant to FPA Section 206, 16 U.S.C. § 824e(a), which requires that, "whenever the Commission 'shall find that any rate [or] charge'—or 'any rule, regulation, practice, or contract affecting such rate [or] charge'—is 'unjust [or] unreasonable,' then the Commission 'shall determine the just and reasonable rate, charge[,] rule, regulation, practice or contract' and impose 'the same by order.'" *FERC v. Elec. Power Supply Ass'n* ("*EPSA*"), 136 S. Ct. 760, 774 (2016), *as revised* (Jan. 28, 2016) (quoting FPA Section 206, 16 U.S.C. § 824e(a)). Through the FPA, FERC obtained "the authority—and, indeed, the duty—to ensure that rules or practices 'affecting' wholesale rates are just and reasonable." *Id.*

---

[16] While Coaltrain asserts in passing that 18 C.F.R. § 35.41(b) did not go through the notice and comment process, it does not elaborate on the basis of its belief that the Rule did not undergo that requirement or articulate any argument that FERC lacked authority to promulgate 18 C.F.R. § 35.41(b) on that basis. *See* Coaltrain Mot. 44, ECF No. 25.

In 2001, FERC initiated proceedings pursuant to that statutory authority to "investigate the justness and reasonableness of the terms and conditions of market-based rate tariffs and authorizations" in the wake of a series of abusive practices committed by certain entities that triggered the Western Energy Crisis of 2000 and 2001. *Order Establishing Refund Effective Date and Proposing to Revise Market-Based Rate Tariffs and Authorizations*, 97 FERC ¶ 61,220, at ¶ 61,974 (2001). After a period of notice and comment, the Commission added the Market Behavior Rules to its existing requirements for tariffs[17] and authorizations governing Sellers in the wholesale energy market. *Order Amending Market-Based Rate Tariffs and Authorizations*, 105 FERC ¶ 61,218 (2003); *see also Colo. Office of Consumer Counsel v. FERC*, 490 F.3d 954, 957 (D.D.C. 2007) ("Having . . . initiated an investigation into the specific issues of anticompetitive behavior and market manipulation, the Commission proposed conditioning all market-based rate tariffs on new Market Behavior Rules that would prohibit these practices."). One such rule, Market Behavior Rule 3, prohibited Sellers from providing false or misleading information, or omitting material information, in any communication with the Commission and other Commission-approved actors that facilitate the wholesale market for electricity. 105 FERC ¶ 61,218, at ¶ 106. In adopting this rule, the Commission recognized

---

[17] "A Tariff is a compilation of Terms and Conditions of Service, rates and schedules, contracts and a copy of each form of service agreement, of a particular regular entity, as required by the various statutes and Commission Regulation." FERC, *eTariff Viewer Guide* (Sept. 2015), *available at* https://ferc.gov/docs-filing/etariff.asp.

that "[t]he integrity of the processes established by the Commission for open competitive markets rely on the openness and honesty of market participant communications." *Id.* at ¶ 107.

In 2005, Congress passed the Energy Policy Act of 2005 ("EPAct"), Pub. L. 109-58, which made several amendments to the FPA.  Upon passage of the EPAct, FERC codified some of its Market Behavior Rules and rescinded others as redundant in light of the new legislation.  Market Behavior Rule 3 is codified, without changes, at 18 C.F.R. § 35.41(b).[18]  *Order Revising Market-Based Rate Tariffs and Authorizations*, 114 FERC ¶ 61,165 (2006).  The regulation reads in its entirety:

> Communications.  A Seller must provide accurate and factual information and not submit false or misleading information, or omit material information, in any communication with the Commission, Commission-approved market monitors, Commission-approved regional transmission organizations, Commission-approved independent system operators, or jurisdictional transmission providers, unless Seller exercises due diligence to prevent such occurrences.

18 C.F.R. § 35.41(b).

To the extent Congress's mandate that FERC regulate any "practice . . . affecting [wholesale] rate[s]" is ambiguous, the Court concludes that FERC's false-statement regulation via 18 C.F.R. § 35.41(b) is a reasonable interpretation of that mandate.  *See Chevron*, 467 U.S. at 842–43 (explaining that, if Congress has not clearly spoken on the issue, the Court must determine if the agency's

---

[18] Market Behavior Rule 3 was originally codified at 16 U.S.C. § 35.37 but was later moved to § 35.41 without any change in substance.

interpretation of the statute is reasonable). When it adopted Market Behavior Rule 3 in 2003, the Commission concluded that honest communications between Sellers and the Commission and its staff played an integral role in allowing FERC to effectively carry out its mandate to ensure just and reasonable wholesale rates. *See* 105 FERC ¶ 61,218, at ¶ 107. It did so after concluding that "the electric market structure and market rules . . . [were] seriously flawed . . . [and] have caused . . . unjust and unreasonable rates," 93 FERC ¶ 61,121, at ¶ 61,349 (2000), and that greater "behavioral prohibitions," including Market Behavior Rule 3, were required to "clearly[ ]delineate[] rules of the road to govern market participant conduct" and ensure that rates would remain just and reasonable. 105 FERC ¶ 61,218, at ¶ 3. The Rule was thus promulgated pursuant to a reasonable interpretation of FERC's authority to regulate practices and rules that affect the rate of electricity.

FERC's interpretation of Section 206 as granting it authority to adopt a rule regulating statements made by Sellers to the Commission is also consistent with the Supreme Court's "common-sense construction" of Section 206 that "limit[s] FERC's 'affecting' jurisdiction to rules or practices that '*directly* affect the [wholesale] rate'" of electricity. *EPSA*, 136 S. Ct. at 774 (italics and alterations in original) (citation omitted) (reasoning that this statutory construction would prevent the statute—if "affecting" were read in its most literal sense—"from assuming near-infinite breadth"). The regulation itself is limited in scope: it applies only to communications made between "Sellers" and "the Commission"

and entities "subject to [the Commission's] jurisdiction." 18 C.F.R. § 35.41(b); 105 FERC ¶ 61,218, at ¶ 108. When it promulgated the regulation, FERC found this limitation was "appropriate to assure sellers that the information sought or provided hereunder will be directly related to the wholesale transactions for which they have received market-based rate authority." 105 FERC ¶ 61,218, at ¶ 108.

Moreover, the regulation is properly limited to false statements that will "directly affect" the rate of wholesale electricity. It is reasonable to assume, as FERC did when promulgating the rule, that whenever Sellers, in the absence of due diligence, fail to "provide accurate and factual information" and instead "submit false or misleading information, or omit material information," in their communications with the Commission, 18 C.F.R. § 35.41(b), their statements are likely to affect the Commission's ability to regulate wholesale rates. Logically, if the "organizations and entities tasked by the Commission with the responsibility of carrying out . . . wholesale electric market administration," 105 FERC at ¶ 107, are relying on false or misleading information while fixing wholesale rates and evaluate the effectiveness of their current rules that fix those rates, that information will "directly affect" those rates. That the rule in this case was applied to statements made during enforcement investigations does not undermine this conclusion. In FERC's Penalty Order against Defendants it explains that "investigations are part of the Commission's authority to ensure just and reasonable rates under FPA [S]ection 206 . . . ." Investigations are just one

mechanism by which the Commission establishes rules delineating conduct on the wholesale electricity market—all of which directly affects the wholesale rates.

The Court therefore defers to FERC's interpretation of its authority to regulate practices affecting wholesale electricity to cover disclosures of information and omissions of material information "in any communication with the Commission," and finds that the Rule of Candor, 18 C.F.R. § 35.41(b), falls within FERC's delegated authority to regulate practices affecting wholesale rates of electricity. *See Calif. Indep. Sys. Operator Corp. v. FERC*, 372 F.3d 395, 399–401 (D.C. Cir. 2004) ("[I]f the statute is ambiguous and the agency has acted within its delegated authority, we will defer to the agency's interpretation if it is reasonable.").

Defendants' counter-arguments are unavailing.

First, Defendants aver that FERC "did not have general false statement authority" because it had no civil penalty authority over false statements "prior to EPAct of 2005." They make much of this fact, quoting various pre-EPAct statements in which FERC acknowledged that it lacked authority to assess civil penalties for violations of Market Behavior Rule 3. But Defendants' argument suffers an obvious, fatal flaw—it conflates FERC's general authority to *regulate false statements* with its authority to *impose civil penalties* on Sellers who make false statements. To be sure, FERC did previously acknowledge that it lacked civil penalty authority to regulate false statements (and many other unlawful actions affecting wholesale rates) and asked Congress for such authority through

the EPAct.  *See* FERC, *Energy Market Oversight and Enforcement: Accomplishments and Proposal for Enhanced Penalty Authority*, at 1, 24 (March 2005) ("Staff Proposal"), *available at* http://www.ferc.gov/legal/maj-ord-reg/land-docs/03-2005-cp-rept.pdf (noting that FERC had limited options to remedy misconduct by market participants "[w]here a market participant engage[d] in misconduct but no profit [could] be proven to have resulted from that misconduct, the violative conduct [could] go unpunished," and recommending legislative amendments to broaden FERC's remedial powers).  With Congress's passage of the EPAct shortly thereafter, it gave FERC exactly that.  *See* FPA Section 316A, 16 U.S.C. § 825*o*-1(b) (allowing FERC to assess civil penalties for violations of any of its provisions in an amount "not more than $1,000,000 for each day that such violation continues").  Unsurprisingly, then, FERC began assessing civil penalties against violators of 18 C.F.R. § 35.41(b) only after the passage of the EPAct.  That FERC received newfound authorization from Congress in 2005 to impose civil penalties on market participants who violate rules promulgated under Section 206 (including the Rule of Candor) does not indicate, as Defendants suggest, that FERC lacked authority under Section 206, prior to 2005, to regulate false statements (and, thus, promulgate the Candor Rule) at all.  Defendants' assertion that FERC acknowledged it lacked civil penalty authority over false statements, in short, proves nothing.

Finally, Defendants fail to demonstrate that by adding a specific false-statement provision to the FPA—Section 221, 16 U.S.C. § 824u—through the

EPAct, Congress "intended to narrowly circumscribe FERC's authority, limiting it to highly specific statements in the price reporting area." Coaltrain Mot. 43, ECF No. 25. Section 221 reads in its entirety:

> No entity (including an entity described in section 824(f) of this title) shall willfully and knowingly report any information relating to the price of electricity sold at wholesale or the availability of transmission capacity, which information the person or any other entity knew to be false at the time of the reporting, to a Federal agency with intent to fraudulently affect the data being compiled by the Federal agency.

16 U.S.C. § 824u.

This provision is neither an explicit nor implicit repeal of Section 206's mandate that FERC regulate any "practice . . . affecting [wholesale] rates." Section 221 does not expressly state that it repeals all or any portion of Section 206 and it therefore does not constitute an express repeal. *See Gallenstein v. United States*, 975 F.2d 286, 291 (6th Cir. 1992) ("An express repeal requires that Congress overtly state with specificity that the subsequent statute repeals a portion of the former statute." (citations omitted)). Additionally, because Section 221 deals with a significantly narrower category of conduct than Section 206— *compare* Section 221 (prohibiting all entities from willfully and knowingly reporting false information relating to the price of wholesale electricity or the availability of transmission capacity to a federal agency), *with* Section 206 (directing FERC to regulate any "rule, regulation, practice, or contract" that affects the wholesale rate of electricity)—Congress did not implicitly repeal § 206 by making it irreconcilable

with § 221.[19] *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S.
644, 662–63 (2007) ("While a later enacted statute (such as [EPAct]) can
sometimes operate to amend or even repeal an earlier statutory provision (such
as [FPA Section 206]), 'repeals by implication are not favored' and will not be
presumed unless the 'intention of the legislature to repeal is clear and manifest.'")
(alterations in original omitted); *Gallenstein*, 975 F.2d at 291 ("The rule against
implied repeals states that 'in the absence of some affirmative showing of an
intention to repeal, the only permissible justification for a repeal by implication is
when the earlier and later statutes are irreconcilable.'" (quoting *Morton v.
Mancari*, 417 U.S. 535, 550 (1974)).

Nor does Section 221 repeal FERC's false statement regulation. As
previously noted, FERC did not codify Market Behavior Rule 3 until after Section
221 was enacted into law. This is significant because, in order to codify the rule,
FERC would have had to submit it to Congress, which then would have had a
specified period of time to review and disapprove the rule if it desired. 5 U.S.C.
§ 801. That Market Behavior Rule 3 was codified after Congress enacted the
EPAct (which included FPA Section 221) is thus evidence that Congress actually
approved the rule and by no means intended to limit FERC's false-statement

---

[19] As FERC points out, Section 221 applies to all entities (including "the United States,
a State or any political subdivision of a State," and other entities, 18 U.S.C. §§ 824u.,
824(f)), while 18 C.F.R. § 35.41(b) applies only to "Seller[s]." Section 221 applies only
to "willful[] and knowing[]" violations of its provisions while 18 C.F.R. § 35.41(b) applies
to any violations occurring due to a Seller's failure to exercise "due diligence." Finally,
violations of Section 221 are punishable as felonies, 16 U.S.C. § 825o(a), while
violations of 18 C.F.R. § 35.41(b) are punishable only as misdemeanors, *id.* § 825o(b).

regulatory authority to the circumstances delineated by Section 221. In short, Congress had an opportunity to prevent codification of 18 C.F.R. § 35.41(b) but declined to do so. And the fact that Congress approved the rule's codification after enacting Section 221 nullifies any argument that Section 221 was Congress' mechanism for directing FERC to modify or repeal Market Behavior Rule 3. *See INS v. Chadha*, 462 U.S. 919, 953 (1983). Therefore, the Court finds that FERC acted within its legislative authority when it promulgated Market Behavior Rule 3 and codified it at 18 C.F.R. § 35.41(b).

### 3. FERC's civil penalty against Sheehan and P. Jones for Coaltrain's violation of 18 C.F.R. § 35.41(b)

Finally, Sheehan and P. Jones argue that no civil penalty may be assessed against them for Coaltrain's alleged violation of 18 C.F.R. § 35.41(b). Sheehan and P. Jones aver that because the Rule applies only to regulated "Sellers," and because they are not "Sellers" as the term is defined in § 35.36(a)(1), they cannot have violated the Rule of Candor or be held monetarily responsible for another's violation of the Rule. Thus, they argue, to the extent the penalty assessed against Coaltrain includes a penalty for an alleged violation of § 35.41, they cannot be liable (jointly and severally or otherwise) for that portion of the penalty. That is, even if penalties can be assessed on a joint and several basis in general, Sheehan and P. Jones assert that any penalty against Coaltrain for violating § 35.41(b) cannot be assessed against them as well.

Sheehan additionally moves in the alternative, arguing that even if an individual person could be liable for a violation of § 35.41(b), the claim against him should be dismissed because the Complaint fails to allege any facts showing that Sheehan made a false or misleading statement to FERC.

FERC responds that Sheehan and P. Jones can be held jointly and severally liable for Coaltrain's violation of § 35.41(b). FERC cites *Kourouma v. FERC*, 723 F.3d 274 (D.D.C. 2013) for support. While no party challenged, in that case, FERC's authority to assess penalties against individuals for a company's § 35.41(b) violation, the *Kourouma* court did affirm the imposition of penalties against the company's owner for the company's violation.

The Court is not persuaded that *Kourouma* supports FERC's position, however. As a preliminary matter, as both parties concede, the defendant in *Kourauma* was either a Seller or the court presumed he was a Seller to whom the regulation applied. *See id.* at 253. Additionally, and even more importantly at least as it relates to Sheehan, Kourouma was the person who made the false statements, and the penalty was assessed directly against him since he was found to have violated the regulation. Thus, even if *Kourouma* stands for the proposition that a non-Seller can be liable for a violation of § 35.41(b), it does not hold that a non-Seller can be jointly and severally liable for a company's violation of § 35.41(b), and it certainly does not support the notion that a non-Seller who did not make any false or misleading statements can be so liable.

In any event, FERC's decision in its enforcement proceedings in this case expressly recognizes that neither Sheehan nor P. Jones are liable for the § 35.41 violation. Penalty Order ¶ 331 n.851. It nonetheless holds both Sheehan and P. Jones jointly and severally liable for the civil penalty assessed against Coaltrain, "because they are liable for their fraudulent trading conduct and [the] penalty assessment encompasses both violations . . . ." *Id.* The Court will not affirm this portion of the FERC order. It is axiomatic that even when parties are held jointly and severally liable for a particular sum of damages (or in this case a particular penalty), the threshold requirement is that they are liable for the violation that resulted in the damage (or penalty). The only difference is whether, as liable parties, damages are assessed against each defendant separately or assessed against all liable defendants jointly and severally. As FERC itself has determined that neither Sheehan nor P. Jones are liable for the § 35.41(b) violation, this Court is hard-pressed to see how they can be forced to bear a portion of the penalty for a violation for which they are not liable. Accordingly, the Court finds that neither Sheehan nor P. Jones is liable for the penalty assessed for Coaltrain's § 35.41(b) violation. Whether it is necessary for the Court to ultimately modify the penalties assessed—as suggested by FERC in the event the Court found in Sheehan's and P. Jones's favor on this issue—need not be determined today. Rather, this Opinion and Order is limited to determining that Sheehan and P. Jones cannot be responsible for paying a penalty for a violation that FERC admits they are not liable for.

For all these reasons, the Court finds that FERC's allegations state a plausible claim against Coaltrain for violations of the Rule of Candor and Coaltrain's motion to dismiss this claim against it is **DENIED**. However, P. Jones' and Sheehan's motions to dismiss the Rule of Candor claim against them is **GRANTED**.

## V. CONCLUSION

For the foregoing reasons, P. Jones, R. Jones, and Wells' motion to dismiss, ECF No. 23, is **GRANTED IN PART AND DENIED IN PART**, Coaltrain's motion to dismiss, ECF No. 25, is **DENIED**, and Miller and Sheehan's motion to dismiss, ECF No. 26, is **GRANTED IN PART AND DENIED IN PART**. Specifically, FERC states a plausible claim that all Defendants violated FPA Section 222 and 16 C.F.R. § 1c.2 (Count One), and this claim therefore survives Defendants' motions to dismiss. Once the Court determines whether FERC has, in fact, proved its claim, the Court will review FERC's assessment of civil penalty against all Defendants and make any modifications it deems necessary. Additionally, FERC states a plausible claim that Coaltrain violated 16 C.F.R. § 35.41(b) (Count Two), and this claim therefore survives Coaltrain's motion to dismiss. However, FERC does not state a claim against P. Jones and Sheehan under 18 C.F.R. § 35.41(b) through which it may hold them jointly and severally liable, and FERC may therefore not seek to impose a penalty against P. Jones and Sheehan for any of Coaltrain's purported violations of that Rule.

The parties are also **NOTIFIED** that, in light of the Court's determination that this case shall proceed like any other civil lawsuit governed by the Federal Rules of Civil Procedure, Magistrate Judge Jolson will notice the case for a preliminary pretrial conference.

Finally, since this case was transferred to the Undersigned after the Defendants' motions to dismiss were filed, the Court **REMINDS** the parties to review the Undersigned's Standing Orders regarding page limits and further **ADVISES** them that any requests to exceed those page limits must be made by written motion.

The Clerk is **DIRECTED** to terminate ECF Nos. 23, 25, and 26 from its pending motions list.

      **IT IS SO ORDERED.**

_____
**MICHAEL H. WATSON, JUDGE**
**UNITED STATES DISTRICT COURT**